# PENNSYLVANIA COMPANY *v.* UNITED STATES.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

No. 591. Argued December 14, 15, 1914.—Decided February 23, 1915.

Section 3 of the Act to Regulate Commerce forbids any undue or unreasonable preference or advantage in favor of any person, company, firm, corporation or locality, and what is such undue or unreasonable preference or advantage is not a question of law but of fact.

The courts cannot set aside an order of the Interstate Commerce Commission in regard to interchange of freight by carriers which does not contravene any constitutional limitation and is within the constitutional and statutory authority of that body and is not unsupported by testimony; such an order is only the exercise of the authority vested by the law in the Commission.

Although § 3 of the Act to Regulate Commerce remains in its original form, it must now be read in connection with amendments to, and subsequent provisions of, that Act by which the term transportation covers the entire carriage and services in connection with the receipt and delivery of property transported, including facilities of a terminal character for delivery. As so read, § 3 must be construed with a view to carrying out all the provisions of the Act as it now is and to make every part of it effective in accordance with the intention of Congress.

The Interstate Commission has jurisdiction to require an interstate carrier to receive and transport over its terminals carload interstate freight from one carrier having a physical connection with its lines on the same terms on which it performs such service for other connecting carriers similarly situated.

Such an order is not an appropriation of the terminal property of the carrier in violation of the due process provision of the Fifth Amendment but a regulation of its terminal facilities within the power properly delegated by Congress. *Grand Trunk Ry.* v. *Michigan Railway Commission*, 231 U. S. 457, followed; *Louis. & Nash. R. R.* v. *Stock Yards Co.*, 212 U. S. 132, distinguished.

Congress may so control the terminal facilities of a carrier, and the Interstate Commerce Commission may make such orders, as will

prevent creation of monopolies within the prohibitions and limitations of the Anti-trust Act. *United States* v. *St. Louis Terminal*, 224 U. S. 383.

214 Fed. Rep. 445, affirmed.

THE facts, which involve the validity of orders of the Interstate Commerce Commission regarding the establishment of joint and through rates to and from, and regulations as to switching cars at, New Castle, Pennsylvania, by the Pennsylvania Company, are stated in the opinion.

*Mr. Frederic D. McKenney*, with whom *Mr. A. P. Burgwin* and *Mr. Gordon Fisher* were on the brief, for appellant:

In the absence of statute there is no principle of established law which requires one carrier to share the use and advantages of its terminals with another carrier, a competitor engaged in like business. As private property, still in the absence of statute, the use of terminals are the subject of contract at the will of their owner who may elect to share their advantages with some carriers while denying them to others. The only statute which concerns the present issue is the Act to Regulate Commerce, which, while forbidding (§ 3), undue or unreasonable preference or advantage "to any particular person, company, firm, corporation, or locality, or any particular description of traffic," and though requiring common carriers subject to its provisions "according to their respective powers" to "afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of . . . property to and from their respective lines and those connecting therewith," expressly declares that "this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business," such exception very accurately defining the very object and purpose which the Rochester Company in and by its proceeding before the

Commission sought, and by virtue of the order of the Commission, if same shall be upheld, will have obtained. *Kentucky Bridge Co.* v. *L. & N. Ry.*, 37 Fed. Rep. 567, 573; *Oregon Short-Line* v. *Northern Pac. Co.*, 61 Fed. Rep. 158; *Little Rock Co.* v. *St. Louis Co.*, 63 Fed. Rep. 775.

The fact that the Congress when making the extensive amendments of 1906 and 1910, did not see fit to alter § 3 relating to the affording of equal facilities for the interchange of traffic between carriers (on which the order here made was based) is highly persuasive that it intended to leave the law and its practical working exactly as it had been. *Spokane* v. *Nor. Pac. R. R.*, 15 I. C. C. 376, 398.

The Commission itself in several proceedings before it has held that industrial tracks of this character form a part of the terminal facilities of a carrier, and that it lacks power to compel their use in favor of another carrier engaged in like business. *Morris Co.* v. *B. & O. R. R.*, 26 I. C. C. 240, 244. See also *Waverly Oil Works Co.* v. *Penna. R. R.*, 28 I. C. C. 621, 627.

Based upon the decisions cited, the finding of the Commission that the reciprocal switch agreements complained of are or were unduly discriminatory is wholly immaterial, the statute itself having declared carriers' terminals as such to be beyond the reach of the Commission's regulatory power, thus leaving the carriers themselves as free to deal with terminals and their use as they had been before the enactment of the statute. *Bridge Co.* v. *L. & N. R. R.*, 37 Fed. Rep. 567, 573; *Little Rock Co.* v. *St. Louis Co.*, 63 Fed. Rep. 775, 779.

*The Solicitor General,* with whom *Mr. Blackburn Esterline* was on the brief, for the United States:

The practice of the Pennsylvania Company constituted an undue and unreasonable discrimination as against the complainant carrier and the shippers on its lines.

Undue discrimination is a question of fact, as to which the finding of the Commission is conclusive. *Int. Com. Comm.* v. *Alabama Midland Ry.*, 168 U. S. 144, 170; *Tex. & Pac. Ry.* v. *Int. Com. Comm.*, 162 U. S. 197, 219.

And this finding of fact is not now open to review. *Balt. & Ohio R. R.* v. *Pitcairn Coal Co.*, 215 U. S. 481; *United States* v. *Louis. & Nash. R. R.*, 235 U. S. 314.

The order of the Commission finding the discrimination unreasonable cannot be said to be without substantial evidence to support it or contrary to the indisputable character of the evidence.

The order did not exceed the power of the Commission or require the appellant to give to the Buffalo, Rochester & Pittsburg Railway the use of its terminals.

The service sought by the complaining company is a service of transportation, the performance of which is expressly commanded.

All that is sought to be forbidden by the order of the Interstate Commerce Commission is the furnishing of transportation for one and the arbitrary declination to do so for another.

The order of the Commission and the opinion of the court below are fully supported by the decision of this court in *Grand Trunk Ry.* v. *Michigan R. R. Commission*, 231 U. S. 457.

Congress has deliberately rejected as contrary to the public welfare the policy for which appellant contends, namely, that of absolute and unrestricted monopoly in the control and use of its terminals.

A carrier's terminal tracks may be put to the legitimate uses of transportation for the benefit of the public just as may its main lines. *St. L., S. & P. R. R.* v. *Peoria & Pekin Un. Ry.*, 26 I. C. C. 226, 237.

The proviso of § 3 of the Act to Regulate Commerce, though not repealed, must be read in the light of later amendments.

The order is not obnoxious to the Fifth Amendment.

What is sought here is a mere regulation of a discriminatory practice. There is no taking of property, and the question of compensation is not involved. *Chi., Mil. & St. P. Ry.* v. *State of Iowa,* 233 U. S. 334, and cases there cited.

*Mr. Charles W. Needham,* with whom *Mr. Joseph W. Folk* was on the brief, for the Interstate Commerce Commission.

*Mr. William A. Glasgow, Jr.,* for the Buffalo, Rochester & Pittsburgh Railway:

The service required of the Pennsylvania Company was a transportation service and that Company was required by § 1 of the Act to "furnish such transportation upon reasonable request therefor."

It was the duty of the Pennsylvania Company, upon request, to establish through routes and joint rates with the Buffalo, Rochester & Pittsburgh Railway Company covering the transportation to and from points on the lines of road of the Pennsylvania Company within the District of New Castle.

The Commission's order is justified by the second paragraph of § 3 of the Act to Regulate Commerce.

In support of these contentions, see *Grand Trunk Ry.* v. *Mich. Ry. Commission,* 231 U. S. 457; *Int. Com. Comm.* v. *D., L. & W. R. R.,* 220 U. S. 235; *Kentucky & Indiana Bridge* v. *Louis. & Nash. R. R.,* 37 Fed. Rep. 567; *Louis. & Nash. R. R.* v. *Stockyards Co.,* 212 U. S. 132; *Louis. & Nash. R. R.* v. *United States,* 216 Fed. Rep. 672; *Penna. R. R.* v. *International Coal Co.,* 230 U. S. 184; *Tex. & Pac. Ry.* v. *Int. Com. Comm.,* 162 U. S. 197.

MR. JUSTICE DAY delivered the opinion of the court.

This case comes here by appeal from an order of the District Court of the United States for the Western Dis-

trict of Pennsylvania, denying a motion for interlocutory injunction against the Interstate Commerce Commission. 214 Fed. Rep. 445.

The Buffalo, Rochester & Pittsburgh Railway Company, hereinafter called the Rochester Company, filed its petition before the Interstate Commerce Commission against the Pennsylvania Company, averring that in the City of New Castle, Pennsylvania, there was a physical connection between the railroads jointly operated by the Rochester Company and the Baltimore & Ohio Railroad Company, and the terminal facilities of the Pennsylvania Company, at which joint traffic could be properly exchanged, and is exchanged between the railroad operated by the Rochester Company and the Baltimore & Ohio Railroad, so that traffic on the lines owned and operated by the Rochester Company, and from manufactories and industries reached by the terminal lines of said company in the City of New Castle can be delivered to the Pennsylvania Company and thus transported to its destination; that there are no joint routes or through rates in effect between the Rochester Company and the Pennsylvania Company by which traffic to and from industries upon the terminal line of the Pennsylvania Company in or near the City of New Castle may be carried and although complainant had frequently requested the Pennsylvania Company to join in establishing the same, the Pennsylvania Company failed and neglected so to do; that the Rochester Company, upon interstate traffic carried by it to the point of physical connection with the road of the Pennsylvania Company, which traffic is destined to manufactories or industries upon the lines of the Pennsylvania Company in or near the city of New Castle, is ready and willing, and has offered to pay the Pennsylvania Company its lawful and proper charges for receiving, carrying and delivering such traffic, which charges it makes to other persons or companies for like services;

that the action of the Pennsylvania Company in declining to receive, carry and deliver to the point of physical connection aforesaid, interstate traffic offered by the Rochester Company subjects said company and shippers of interstate traffic over its lines destined to the manufactories and industries upon the line of the said Pennsylvania Company to an undue and unreasonable prejudice and disadvantage, and is in violation of § 3 of the Act to Regulate Commerce (Feb. 4, 1887, c. 104, 24 Stat. 379), in that it constitutes a failure to afford reasonable, proper and equal facilities to complainant with those afforded to other persons for the interchange of traffic between their respective lines, and for the receiving, forwarding and delivering of property to and from their several lines; that there are no other through routes and joint rates in effect to which the Rochester Company and Pennsylvania Company are parties for the through transportation of interstate traffic carried by the Rochester Company, destined to the manufactories and industries on the lines of the Pennsylvania Company, in or near said city, nor are there any through routes or joint rates in effect between the companies for interstate traffic originating at the manufactories and industries on the lines of the Pennsylvania Company in or near New Castle, destined to points upon the line of the Rochester Company or points which are reached by its connections; and that the failure and refusal of the Pennsylvania Company is forbidden by § 15 of the Act to Regulate Commerce. The Rochester Company prayed for an order commanding the Pennsylvania Company to cease and desist from such violations of the Act to Regulate Commerce, and for such orders as might be deemed necessary, and that the Commission should establish through routes and joint rates on articles of merchandise tendered to the Pennsylvania Company at the point of physical connection above set forth for delivery on the lines of defendant's railroad, in or near

the said city of New Castle, and from the industries and manufactories on the lines of the above named railroad in or near the city of New Castle to points on the line of the Rochester Company or its connections; said joint rates so established to be the maximum to be charged, and that the Commission prescribe a division of the same and the terms upon which such through route can be operated.

The Commission made no order establishing through routes and joint rates, but held that inasmuch as the Pennsylvania Company's refusal to accept from and move to the Rochester Company carload lots of freight within the switching limits of New Castle, while performing the service in connection with the said other three carriers within said switching limits was a discrimination, the same was undue, unreasonable, and in violation of the Act to Regulate Commerce. The Commission ordered that the Pennsylvania Company be required on or before March 15, 1914, to cease and desist from such undue and unreasonable prejudice and disadvantage as against the Rochester Company, and required the Pennsylvania Company to establish and maintain rates, regulations and practices which would prevent and avoid the aforesaid undue and unreasonable prejudice and disadvantage for a period of two years. Subsequently orders were made, making the order effective from a later date, to-wit, April 15, 1914.

From the facts found by the Commission it appears that New Castle is a manufacturing city of much importance, having a population of about forty thousand people, situated near the center of the iron, steel and ore industries of the Mahoning and Shenango Valleys. The switching limits of New Castle in their greatest length are about four miles in extent, and included therein are about 100 industries. The Pennsylvania Railroad, the Baltimore & Ohio Railroad, the Pittsburgh & Lake Erie Railroad, the Erie Railroad, and the Rochester Railroad all reach and

serve New Castle by their several lines of railroad. Each of the four roads has switching connections with the Pennsylvania Company with interchange tracks and terminals within the switching limits. The Rochester road operates a line of railroad from Rochester and Buffalo, in the State of New York, to New Castle and Pittsburgh, in the State of Pennsylvania. It reaches New Castle from the town of Butler, Pennsylvania, over the rails of the Allegheny & Western Railroad, which are now jointly used by the Rochester Company and the Baltimore & Ohio Railroad, under a contract between them. The terminal facilities of the Pennsylvania Company at New Castle consist of depots, freight stations, yards, team tracks and side tracks, together with spur tracks reaching 26 industries within the switching limits. Within the switching limits there are two points of connection with the lines of the Pennsylvania Company, and those jointly used by the Baltimore & Ohio and the Rochester road. One of these points is at Moravia Street, near the center of the city, where the Pennsylvania Company has interchange yards with a capacity for 250 cars. This point is about 1000 feet from the freight station of the Rochester road, where the latter road has two unloading tracks of ten cars capacity each and a team track of twelve cars capacity. The second point of connection is near the outer yards of the Pennsylvania Company, where there are ample facilities for interchange of traffic.

The Pennsylvania Company refuses all interchange of carload freight, whether incoming or outgoing, with the Rochester road within the switching limits of New Castle, but it does conduct such interchange with the Erie, the Pittsburgh & Lake Erie, and the Baltimore & Ohio roads. As to these roads the Pennsylvania Company has published its tariffs, and offers to receive, transport and deliver to and from the lines of these three carriers carload shipments to and from about 128 industries within the

switching limits and immediate vicinity of New Castle, at a charge of $2.00 per car within the limits and a varying charge with a maximum of $5.00 per car without the limits. The industries on the tracks of the Pennsylvania Company within the switching limits, which receive carload freight from the Rochester road, or which may desire to ship such freight over the Rochester road, to points beyond New Castle, must dray their traffic to and from the depot or team track of the Rochester Company. Representatives of such industries testified as to the disadvantage to them resulting from the refusal of the Pennsylvania Company to perform switching service on traffic moving over the line of the Rochester Company.

The Commission found this practice to be an undue and unreasonable discrimination against the Rochester Company, and made an order requiring the Pennsylvania Company to desist therefrom. Commissioner Harlan dissenting was disposed to agree to an order fixing reasonable joint through rates for the use of the terminals of the Pennsylvania Company and over the rails of the Rochester Company, but disagreed with the order on the grounds made. The Pennsylvania Company then filed the bill in this case in the District Court of the United States for the Western District of Pennsylvania, and moved for a preliminary injunction, restraining the enforcement of the order. Answer was filed on behalf of the United States, and the Interstate Commerce Commission and the Rochester Company intervened, and, after hearing, the motion was denied, two judges concurring and one judge dissenting. *Pennsylvania Company* v. *United States*, 214 Fed. Rep. 445. From this action the Pennsylvania Company appeals, and the case is now before this court.

Section 3 of the Act to Regulate Commerce, 24 Stat. 379, 380, provides:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue

or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

This section forbids any undue or unreasonable preference or advantage in favor of any person, company, firm, corporation or locality; what is such undue or unreasonable preference or advantage is a question not of law, but of fact. *Texas & Pacific Ry.* v. *Interstate Commerce Commission*, 162 U. S. 197, 219; *Interstate Commerce Commission* v. *Alabama Midland Railway*, 168 U. S. 144, 170. If the order made by the Commission does not contravene any constitutional limitation and is within the constitutional and statutory authority of that body, and not unsupported by testimony, it cannot be set aside by the courts, as it is only the exercise of an authority which the law vests in the Commission. *Interstate Commerce Commission* v. *Delaware, Lackawanna & Western R. R.*, 220 U. S. 235, 251; *Los Angeles Switching Case*, 234 U. S. 294, 311; *Houston & Texas Ry.* v. *United States*, 234 U. S. 342, 359.

It is to be remembered that in the aspect which the case

now presents, there is no question as to the terms which
the Commission might prescribe, or the compensation
which the Pennsylvania Company should receive for the
service to be rendered. The sole question is whether the
Commission exceeded its authority in requiring the Penn-
sylvania Company to cease and desist from what the
Commission found to be a discriminatory practice.

In determining whether the Commission exceeded its
authority under § 3 of the Act to Regulate Commerce,
it is essential to consider the character of the service re-
quired in the present case. Section 3 was a part of the
original Act, and remains unchanged, but there are cer-
tain amendments to the Act which are to be read in con-
nection with § 3 as if they were originally incorporated
within the Act. *Blair* v. *Chicago*, 201 U. S. 400, 475. The
Act as amended June 29, 1906, c. 3591, 34 Stat. 584, de-
fines what is meant by common carriers—engaged in
transportation by railroad—which are brought within the
control of the Act, and a railroad is defined to include all
switches, spurs, tracks and terminal facilities of every
kind, used or necessary in the transportation of persons
or property designated in the Act, and also all freight
depots, yards and grounds used or necessary in the trans-
portation or delivery of any of said property. Not only
does the Act define railroads, but it specifically defines
what is meant by transportation, which is made to include
"cars and other vehicles and all instrumentalities and
facilities of shipment or carriage, irrespective of ownership
or of any contract, express or implied, for the use thereof
and all services in connection with the receipt, delivery,
elevation, and transfer in transit, ventilation, refrigera-
tion or icing, storage, and handling of property trans-
ported." It is made the duty of every carrier "subject
to the provisions of this Act to provide and furnish such
transportation upon reasonable request therefor, and to
establish through routes and just and reasonable rates ap-

plicable thereto"; and on June 18, 1910, c. 309, 36 Stat. 539, 545, it was additionally provided that the carrier should "provide reasonable facilities for operating such through routes and make reasonable rules and regulations with respect to the exchange, interchange, and return of cars used therein, and for the operation of such through routes, and providing for reasonable compensation to those entitled thereto." See *United States* v. *Union Stock Yard & Transit Co.*, 226 U. S. 286, and as to the character of such commerce, *Illinois Central R. R.* v. *Railroad Commission of Louisiana*, decided February 1, 1915, *ante*, p. 157.

It follows that the provisions of § 3 of the Act must be read in connection with the amendments and subsequent provisions, which show that transportation as used in the Act covers the entire carriage and services in connection with the receipt and delivery of property transported. There can be no question that when the Pennsylvania Railroad used these terminal facilities in connection with the receipt and delivery of carload freight transported in interstate traffic, it was subject to the provisions of the Act, and it was obliged as a common carrier in that capacity to afford all reasonable, proper and equal facilities for the interchange of traffic with connecting lines and for the receiving, forwarding and delivering of property to and from its own lines and such connecting lines, and was obliged not to discriminate in rates and charges between such connecting lines. By the amendments to the Act, the facilities for delivering freight of a terminal character are brought within the terms of the transportation to be regulated.

The cars transported over the Rochester road are brought to a physical connection with the Pennsylvania road at a point where it receives carloads of freight from other roads and transports them over its connecting terminals to points of destination, and at that point in like

manner forwards over other railroads carloads of freight transported in interstate commerce and destined for points on such other connecting railroads.

If the cars of the Rochester Company reaching the point of connection are drawn by a Baltimore & Ohio locomotive they are received and delivered by the Pennsylvania Company over its terminals.

The Pennsylvania Company insists that these statutory provisions do not apply to it under the circumstances of this case, and that the Commission exceeded its authority in requiring it to desist from what the Commission found to be a discriminatory practice, for certain reasons which, as we understand them, may be reduced to three: (a) That upon the facts shown there is no discrimination in a real sense, and certainly none which warrants the making of the order in question; (b) That the order requires the railroad company to give up the use of its terminals to another company in violation of the last clause of § 3; and (c) that the order is a taking of the railroad company's property in violation of the protection afforded to it under the Constitution of the United States, preventing the taking of property without due process of law, for the contention is that the effect of the order is to subject the Pennsylvania Railroad's property to the use of the Rochester Company without compensation.

That there is no discrimination in fact is rested upon the argument that with the other three roads the Pennsylvania Railroad has certain reciprocal arrangements in the Mahoning and Shenango Valleys, by which these three roads interchange cars with the Pennsylvania Railroad. It is contended that this, more than the $2.00 per car, is the real inducement for the treatment of those railroads. But, as the Commission found, the amount of traffic exchanged between these three railroads is of a varying and differing quantity, and to ascertain the value of such service to the Pennsylvania Railroad would be a futile under-

taking, involving uncertain and speculative considerations as to the value of this and that service and the varying cost of performing such service at remote and different places. The statements in the record, presented to the Commission by the Pennsylvania Company, show the great difference in service of this character rendered by the three railroads and by the Pennsylvania Company for the different roads. For instance, it is shown that during 1911 the Baltimore & Ohio switched for the Pennsylvania 69 cars at New Castle, and in the Valleys generally 4,185 cars, while the Pennsylvania Company switched for the Baltimore & Ohio 8,286 cars in New Castle, and in the Valleys generally 8,900 cars. The Rochester Company switched for the Pennsylvania in the same year 406 cars in New Castle and 3,661 cars to points adjacent thereto. The Rochester Company moved for the Pennsylvania Company in New Castle 337 cars more than did the Baltimore & Ohio, and in gross totals, through and into adjacent regions, 187 cars less. The Pennsylvania Company moved nearly twice as many cars for the Baltimore & Ohio road as the Baltimore & Ohio did for it. The Government therefore contends with much force that such reciprocal switching arrangements ought not to justify giving cars shipped over the Baltimore & Ohio Railroad a preference denied the cars shipped over the lines of the Rochester road, which cars enter New Castle on the same track and reach the same junction points. And as we have said the question of compensation is not here involved, and what compensation the Pennsylvania Company might require from the Rochester Company is not now to be determined. We agree with the Commission and the court below that the alleged reciprocal shipping arrangements do not remove the discriminatory character of the treatment of the Rochester road.

The objection that the railroad is required to give up the use of its terminals to another company, is perhaps

the principal contention of the Pennsylvania Company, and is based upon the last clause of the second paragraph of § 3, which provides that the section shall not be construed as requiring any common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business.

As we have heretofore shown, the Act, as it now is, provides that transportation which must be furnished to all upon equal terms includes the delivery of freight as part of its transportation. While § 3 remains part of the Act in its original form, it must be given a reasonable construction with a view to carrying out all the provisions of the Act and to make every part of it effective, in accordance with the intention of Congress.

The majority of the District Court thought the present case was controlled by the case of *Grand Trunk Ry.* v. *Michigan Railroad Commission*, 231 U. S. 457, and certainly that case is closely analogous to the present one. In that case the Michigan statute, which was enforced by the State Commission, as to intrastate commerce, required railroads in that State to afford reasonable and proper facilities, by the establishment of switching connections between the roads and the establishment of depots and freight yards for the interchange of traffic, for the receiving, forwarding and delivering of passengers and property to and from other lines and those connecting therewith, and to transport and deliver without undue delay and discrimination freight and cars destined to any point on its own lines or connecting lines, and not to discriminate in rates and charges between connecting lines. That act, like the Federal act, contained a provision that nothing therein should be construed as requiring any railroad to give the use of its tracks and terminal facilities to another railroad engaged in like business. This court sustained an order of the Commission requiring the Grand Trunk Railway to accept freight for other roads at con-

nected points for shipment in the city of Detroit. In that connection this court stated the question to be (p. 464):

"Whether, under the statutes of the State of Michigan, appellants can be compelled to use the tracks it owns and operates in the city of Detroit for the interchange of intrastate traffic; or, stating the question more specifically, whether the companies shall receive cars from another carrier at a junction point or physical connection with such carrier within the corporate limits of Detroit for transportation to the team tracks of the companies; and whether the companies shall allow the use of their team tracks for cars to be hauled from their team tracks to a junction point or physical connection with another carrier within such limits and be required to haul such cars in either of the above-named movements or between industrial sidings."

In answering the contention that the service required was not transportation, but amounted to an appropriation of the terminal facilities of the Grand Trunk Railway, this court said (p. 467):

"The proposition of appellants is, as said by the District Court, that such service and team track service 'are not in a proper sense transportation, but are essentially distinguishable therefrom'; or, to put it another way—and one which expresses more specially the contention of appellants—they are mere conveniences at the destination or initial point of the transportation and hence are terminal facilities merely and their use is not required to be given to other railroads. The District Court did not regard them in the latter character. After stating the conditions which exist in Detroit and its extent, the court said of them: 'Such tracks are necessary to prevent the congestion which would result from requiring all carload freight, both in and out, to be delivered at the freight depots of the respective roads, and in a very proper sense are shipping stations.' The court concluded that the services were

transportation and that the statute of the State validly
empowered the Commission 'to require local transporta-
tion by a railroad between its own shipping stations within
a city, whether such plurality of shipping stations has been
voluntarily established by the railroad, as here, or has
been required by the Commission under its lawful powers,
and provided such transportation is for such substantial
distance and of such a character as reasonably to require a
railroad haul, as distinguished from other means of car-
riage.' The court further said: 'It is clear that a statute
validly may, and the statutes we are considering do, au-
thorize the employment of such depots, sidetracks, and
team tracks of a railroad for transporting carload freight
to and from the junction of such road with another road
as a substantial part of a continuous transportation rout-
ing, where such junction is outside the city limits.' And
it was remarked that the fact that the freight movement
begins and ends within the limits of a city does not take
from it its character 'of an actual transportation between
two termini,' the other conditions obtaining. We concur
in the conclusion of the court."

After describing the extent of the city of Detroit to be
about 22 miles, and its population about 500,000, the court
held that it was competent for the state commission to
require transportation between points in that city, as the
beginning and destination of traffic, and that to call the
service necessary to such movement a taking of terminals
was misleading, and that the statute involved was a proper
regulation of the business of appellants, and not an ap-
propriation of their terminal facilities for the use and bene-
fit of another road.

In the present case we think there is no requirement in
the order of the Commission amounting to a compulsory
taking of the use of the terminals of the Pennsylvania
Company by another road, within the inhibition of this
clause of § 3. The order gives the Rochester road no right

to run its cars over the terminals of the Pennsylvania Company or to use or occupy its stations or depots for purposes of its own. There is no requirement that the Rochester Company be permitted to store its cars in the yards of the Pennsylvania Company or to make use of its freight houses or other facilities; but simply that the Pennsylvania Company receive and transport the cars of the Rochester Company over its terminals at New Castle in the same manner and with the same facilities that it affords to other railroads connecting with the Pennsylvania railroad at the same point.

The third and last objection is that the effect of the order of the Commission is to appropriate the property of the Pennsylvania Company without compensation to the use of the Rochester Company, in violation of the Constitution of the United States. Certainly the railroad cannot maintain, in view of the provisions of the statute to which we have referred, that these terminal facilities are exempt from public regulation and under all circumstances subject to its own control, to be dealt with in such manner as it may see fit. This court recognized, in the case of *United States* v. *Terminal R. R. Ass'n,* 224 U. S. 383, that terminal facilities might be so used as to create monopolies, which it was within the power of Congress to control, a power which it might exercise within the prohibitions and limitations of the Sherman Act. So in the present case, all that the order requires the Pennsylvania Company to do is to receive and transport over its terminals by its own motive power, for the Rochester Company, as it does for other companies, similarly situated, carload freight in the course of interstate transportation.

To support the constitutional argument in this connection, reliance is had upon the decision of this court in *Louisville &c. R. R.* v. *Stock Yards,* 212 U. S. 132. That case was also relied upon to support a like argument in the *Grand Trunk Case, supra,* and in the opinion of the

court was analyzed and its application to the situation then presented denied. An examination of the *Louisville Case* shows that it was unlike the one now presented. The Louisville & Nashville Company and the Southern Railway Company were competing companies for the live stock business at Louisville. Each maintained its own stock yards, the yard of the Louisville & Nashville Company being known as the Bourbon Stock Yard, and that of the Southern Railway Company as the Central Stock Yard. (See 118 Fed. Rep. 113, and the same case in this court in 192 U. S. 568.) The Railway Company was ordered in the state court to receive at its stations in Kentucky, and to bill, transport, transfer, switch and deliver in the customary way, at some point of physical connection with the tracks of the Southern Railway, and particularly at one described, all live stock or other freight consigned to the Central Stock Yards or to persons doing business there; to transfer, switch and deliver to the Southern Railway at the said point of connection any and all live stock or other freight coming over its lines in Kentucky, consigned to the Central Stock Yards or persons doing business there; to receive at the same point and to transport, switch, transfer and deliver all live stock consigned to any one at the Bourbon Stock Yards, the shipment of which originates at the Central Stock Yards; and was required, whenever requested by the consignor, consignee, or owner of the stock, at any of the stations, and particularly at its break-up yards in South Louisville, Kentucky, to recognize their right to change the destination, and upon payment of the whole freight rate and proper presentation of the bill of lading duly indorsed, to change the destination and deliver at a point of connection with the Southern Railway tracks for delivery by the latter to the Central Stock Yards. This judgment of the state court was reversed in this court, among other things the court saying (212 U. S., p. 145):

"If the principle is sound, every road into Louisville, by making a physical connection with the Louisville & Nashville, can get the use of its costly terminals and make it do the switching necessary to that end, upon simply paying for the service of carriage. The duty of a carrier to accept goods tendered at its station does not extend to the acceptance of cars offered to it at an arbitrary point near its terminus by a competing road, for the purpose of reaching and using its terminal station. To require such an acceptance from a railroad is to take its property in a very effective sense, and cannot be justified, unless the railroad holds that property subject to greater liabilities than those incident to its calling alone."

As this court said in the *Grand Trunk Case*, the case turned upon the point that the roads were competitive and the point of delivery an arbitrary one and that thereby the terminal station of one company was required to be shared with the other. In that connection it used language applicable to the present situation (231 U. S., p. 472):

"In the case at bar a shipper is contesting for the right, as a part of transportation. The order of the Commission was a recognition of the right and legally so. Considering the theater of the movements, the facilities for them are no more terminal or switching facilities than the depots, side tracks and main lines are terminal facilities in a less densely populated district. A precise distinction between facilities can neither be expressed nor enforced. Transportation is the business of railroads, and when that business may be regulated and to what extent regulated may depend upon circumstances."

So here there is no attempt to appropriate the terminals of the Pennsylvania Company to the use of the Rochester Company. What is here accomplished is only that the same transportation facilities which are afforded to the shipments brought to the point of connection over tracks used in common by the Baltimore & Ohio Railroad and

the Rochester Company, shall be rendered to the Roches-
ter Company as are given to the Baltimore & Ohio Com-
pany under precisely the same circumstances of connec-
tion for the transportation of interstate traffic.  All that
the Commission ordered was that the Company desist
from the discriminatory practice here involved, and in so
doing we think it exceeded neither its statutory authority
nor any constitutional limitation, and that the District
Court was right in so determining.

It follows that the order denying the application for
temporary injunction was properly made, and the judg-
ment must be

*Affirmed.*

MR. CHIEF JUSTICE WHITE, dissenting.

The court now holds that this controversy involves
merely a switching privilege and the duty of one railroad
not to refuse such privilege to another, or at all events
if it permits it to one, to allow it to other roads on terms
of equality.  By a necessary inference, therefore, the
decision now made is concerned alone with that subject
and does not in any degree whatever as a matter of law
involve the right of one railroad company to compel
another to permit it to share in its terminal facilities.
If I could bring my mind to understand the facts of the
controversy as they are now appreciated by the court,
there would be no difficulty whatever on my part in accept-
ing the legal principle which is applied to them.  But
the difficulty which I have is in the premise of fact upon
which the case is decided.  In other words, I have found
it impossible to escape the conclusion that instead of being
one concerning a mere switching privilege, the case is
really one involving the using of terminal facilities.  Dif-
fering only therefore as to an appreciation of the facts I
am very reluctant to express a dissent, a reluctance which
is greatly increased by the consideration that the view

of the facts now taken by the court is the one which was adopted by the court below and which was stated by the Interstate Commerce Commission. Strong, however, as is the admonition resulting from this situation, it is not strong enough to overcome the force of my conviction as to what the case really concerns and to overcome the belief that it is my duty at least to state the fact of my dissent.

MR. JUSTICE McREYNOLDS took no part in the consideration and decision of this case.