Zimmerman, J.
 

 Plaintiffs in error first contend that the Public Utilities Commission of Ohio is without jurisdiction to require a switching interchange between an electric railway and steam railroads, and is consequently without power to fix rates therefor.
 

 Sustaining this contention, Section 522, General Code of Ohio, is quoted. However, upon an examination of several other sections of the Code, notably Sections 501, 614-2 and 614-42, and the decision of this court in
 
 Hocking Valley Ry. Co.
 
 v.
 
 Public Utilities Commission,
 
 107 Ohio St., 43, 140 N. E., 667, it is plain that the jurisdiction of the Public Utilities Commission extends over both steam and electric railroads
 
 *262
 
 and their conjunctive relationships, and that it was empowered to hear and determine this controversy, involving as it does a purely intrastate problem governed by Ohio law.
 

 In support of their argument that no public necessity exists for the establishment of the rates prescribed by the commission, plaintiffs in error cite the cases of
 
 Akron, Canton & Youngstown Ry. Co.
 
 v.
 
 Public Utilities Commission,
 
 96 Ohio St., 359, 117 N. E., 314, and
 
 Wheeling & Lake Erie Rd. Co.
 
 v.
 
 Public Utilities Commission,
 
 96 Ohio St., 370, 117 N. E., 317. Those cases have nothing to do with rates and are not in point. They hold, in effect, that a railroad company is under no duty to establish and maintain a physical connection between its tracks and those of another railroad which cross or intersect the same, unless public necessity demands such an arrangement. Here, there was already a physical connection, directly or indirectly, between the tracks of the electric railway and those of plaintiffs in error, so even the question of public necessity for establishing connection does not arise.
 

 It stands to reason that the public in Youngstown is interested in the establishment of local switching rates which are just and reasonable, because such rates affect to a greater or less degree the prices they must pay for commodities transported to Youngstown by the various railroads serving that community, and which require interchange switching. Besides, as is stated by the commission in its report, “a uniform policy with respect to switching charges adds to flexibility and public convenience in the use of the transportation facilities serving an industrial center and will create conditions favorable to the growth and prosperity of the community.”
 

 As we view it, therefore, the first and paramount issue before the commission for decision was whether the switching rates proposed by plaintiff's in error
 
 *263
 
 were just and reasonable, taking into account all the surrounding facts, circumstances and conditions, and not in violation of law.
 

 In justification of their proposed rates, plaintiffs in error advance several arguments. They frankly admit that the rates charged each other for interchange switching of coal and coke among themselves are materially and substantially less than the rates purposed against the electric railway for similar service, but defend the arrangement on the ground that the service they perform for each other in Youngstown and other important industrial centers throughout the country is of about the same character, and consequently they have seen fit to maintain their reciprocal switching rates at a nominal and wholly unremunerative level.
 
 Contra
 
 this defense, the commission points out that practices whereby a group of common carrier railroads, of distinct and independent corporate existence, in a given locality, switch certain commodities for one another under reciprocal arrangements, and refuse to accord like treatment to another rail carrier operating in the same locality, have often been condemned by both state and federal regulatory authorities, and that even when a lack of reciprocity exists between such group of carriers and an excluded carrier, it affords no excuse for discriminatory, unjust and unreasonable switching rates against the latter, and they will not be tolerated.
 

 Among the numerous authorities cited as sustaining these propositions may be mentioned
 
 Pennsylvania Co.
 
 v.
 
 United States,
 
 236 U. S., 351, 35 S. Ct., 370, 59 L. Ed., 616, and
 
 Chicago, I. & L. Ry. Co.
 
 v.
 
 United States,
 
 270 U. S., 287, 46 S. Ct., 226, 70 L. Ed., 590.
 

 Plaintiffs in error further contend that a lack of reciprocity between themselves and the electric railway, combined with the fact that switching for the latter entails a different and more burdensome under
 
 *264
 
 taking than switching among themselves, fully justifies the proposed rates.
 

 However, the commission found from the evidence that there was no lack of reciprocity between plaintiffs in error and the electric railway. On the contrary, the data produced showed that while the track mileage of the electric railway in the city of Youngstown was appreciably less than that of plaintiffs in error, and that the number of industries served by the electric railway through connection with private sidings did not compare with the same situation as to plaintiffs in error, nevertheless the electric railway bore considerably more than its proportionate ratio of interchange switching. For example, during the years from 1929 to 1933, inclusive, the electric railway delivered 4316 cars of coal for plaintiffs in error, whereas plaintiffs in error delivered but 29 carloads of coal for it.
 

 Pertaining to the contention that switching for the electric railway is different and more burdensome, the commission found that in some instances this was true and in others it was not, but that viewing the situation in its entirety and from an average standpoint, this claim lacked any tenable foundation.
 

 As to the point urged by plaintiffs in error that their actual expense 'in switching a car was sometimes as much as $9.45, the commission found that the basis of such computation rested upon so many factors, embracing both times and conditions, unrelated to the switching situation in Youngstown, that it was worthless as a dependable criterion of such cost there in the year 1934.
 

 Furthermore, attention is directed to the anomaly that plaintiffs in error find apparent satisfaction and profit in performing switching services for the electric railway at the maximum rate of $.19 per net ton, plus $2.70 per car for intermediate switching when necessary, on every commodity excepting coal and
 
 *265
 
 coke, while insisting in the same breath that on the latter commodities a charge several times as great is justifiable, even though the identical time, effort, cost and complications are involved.
 

 At the time this matter was presented to the Public Utilities Commission, the electric railway, frequently in conjunction with the Pittsburgh, Lisbon & Western Railroad, was engaged in transporting coal and coke of Ohio origin adjacent to their lines to the city of Youngstown at a rate of $.60 per net ton. This was business which would not flow to any of plaintiffs in error over their longer routes and at their higher rates. Getting such coal and coke to Youngstown was without obstacle; the difficulty came in securing its delivery at a reasonable rate to consignees served by plaintiffs in error.
 

 If this could be accomplished, at least a portion of such coal and coke would move over the line of the electric railway into Youngstown and could be sold there more or less successfully in competition with the higher grade and more expensive coal and coke brought to Youngstown from Pennsylvania and West Virginia by plaintiffs in error.
 

 There can be no doubt that the primary object of the high switching rates proposed by plaintiffs in error was to keep the Ohio coal and coke off the local market, to the extent that such means would prove effective in so doing.
 

 The electric railway took the stand before the commission that as a matter of justice and in the interests of the public it was entitled to switching rates on an equality with those maintained by plaintiffs in error among themselves and in keeping with the rates charged by plaintiffs in error on all other commodities it transported to Youngstown, excepting coal and coke.
 

 Recognizing its statutory authority to regulate the switching arrangements of railroads, and invoking
 
 *266
 
 the rules, first, that common carriers have no right of election as to the commodities they will carry
 
 (Louisville & Nashville Rd. Co.
 
 v.
 
 United States,
 
 238 U. S., 1, 19, 35 S. Ct., 696, 59 L. Ed., 1177, 1184), and, second, that while common carriers may demand and receive a reasonable compensation for switching and other services, they will not be permitted to restrict traffic over their lines by exacting an excessive or exorbitant charge therefor, the commission considered the evidence pro and con and determined that the proposed switching rates transcended all reasonable bounds, and then proceeded to fix the maximum rates plaintiffs in error might charge for such service as constituting fair and reasonable rates under all the circumstances.
 

 It is not the function or province of this court to fix the switching rates which should be charged at the city of Youngstown, but to affirm or reverse the order of the Public Utilities Commission in that respect.
 

 To reverse such order it must be- found that the action of the commission was unsupported by the evidence, or was so manifestly against the weight of the evidence as to be unlawful or unreasonable.
 

 Since neither of these situations is discernible in the instant case, the order of the commission is affirmed.
 

 Order affirmed.
 

 Weygandt, C. J., Stephenson, Williams, Jones, Matthias and Day, JJ., concur.