The GREAT WESTERN SUGAR
COMPANY, a corporation,
Appellant (Petitioner),

v.

C. E. JOHNSON, John R. Smyth, and G.
Keith Osborn, constituting the Public
Service Commission of Wyoming; and
Montana-Dakota Utilities Co., Appellees
(Respondents).

No. 5350.

Supreme Court of Wyoming.

Feb. 10, 1981.

John A. Sundahl of Godfrey & Sundahl, Cheyenne, for appellant.

John D. Troughton, Atty. Gen., Thomas J. Carroll, III, Sr. Asst. Atty. Gen., and Steven R. Shanahan, Asst. Atty. Gen., Cheyenne, for appellee Public Service Commission.

Edwin H. Whitehead of Urbigkit & Whitehead, P. C., Cheyenne, for appellee Montana-Dakota Utilities Co.

Before ROSE, C. J., and McCLINTOCK, RAPER, THOMAS and ROONEY, JJ.

ROONEY, Justice.

Appellant, an industrial user of gas supplied by Montana-Dakota Utilities Company (hereinafter referred to as MDU) filed a petition for review in the district court challenging an order of appellee Public Service Commission (hereinafter referred to as PSC) which granted to MDU a general rate increase [1] and two pass-on rate adjustments.[2] The district court affirmed the decision of the PSC and denied the petition for review. This appeal is from the action of the district court.

We affirm.

Appellant words the issues here presented as follows:

"1. Was the rating structure which placed a large amount of the increase in the cost of natural gas upon industrial customers unfairly discriminatory, an undue or unreasonable preference or advantage, and unjust in violation of W.S. 37–2–121, W.S. 37–3–101, and W.S. 37–3–104?

"2. Are the natural gas rates as approved by the Public Service Commission [PSC] confiscatory and a violation of due process and equal protection under Article I, Section 2, Article I, Section 6, Article I, Section 34 of the Wyoming Constitution, and the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution?

"3. Is there substantial evidence to support the finding by the Public Service Commission that the rate structure proposed by Montana-Dakota Utilities Company [MDU] was appropriate.

"4. Was there substantial evidence to support the amount of the rate increase awarded to Montana-Dakota Utilities Company?

"5. Was the finding that an increase over the amount testified by the Mon-

---

1. MDU requested an increase of approximately $1,420,882 annually. PSC authorized an increase of $816,988.

2. Pass-on rate adjustments are occasioned by a change in cost of natural gas furnished the utility by its supplier. In this case one of the adjustments was from an increase in supplier cost, and one was from a decrease.

tana-Dakota Utility Company witness justified because the Commission used a different approach to pricing gas an adequate finding of fact and, if it was, was such a finding supporting [sic] by substantial evidence?" (Bracketed material supplied.)

These issues are predicated upon the broader position taken by appellant to the effect that the PSC acted in a discriminatory manner in not fashioning the rate structure only on a cost of service factor, the contention being that there was a lack of evidence to support the fashioning of the rate schedule on other factors such as:

" * * * value of service, availability and location of utility commodity supplies, magnitude of class use and cost of supply replacement, desired method of utility commodity use, alternate fuel capacity, ability to pay and the current gas supply situation * * * to eliminate all rates that promote large use, to minimize rate steps, and to move toward flat rates. * * * " PSC's Finding of Fact No. 25.

Stated another way, appellant contends that the PSC erred in approving a rate structure which requires industrial users of natural gas to pay for the gas on the basis of replacement costs of gas instead of on the basis of the system-wide cost of gas as do residential and small commercial users (hereinafter referred to as residential users). Appellant presents the issues as to whether or not this discrimination or distinction is unjust or unreasonable and as to whether or not the evidence supports the reasonableness of such discrimination or distinction.

### DISCRIMINATION AGAINST INDUSTRIAL USERS

■ There is no question but that the prevention of discrimination is one of the functions of the PSC. The statutes cited by appellant so provide. However, the discrimination which is forbidden therein is characterized as that which is "unjust," "undue" or "unreasonable."

Section 37–2–121, W.S.1977 provides:

"If upon hearing and investigation, any rate shall be found by the commission to be inadequate or unremunerative, or to be unjust, or unreasonable, or *unjustly discriminatory*, or *unduly preferential* or otherwise in any respect in violation of any provision of this act, the commission may fix and order substituted therefor such rate as it shall determine to be just and reasonable and in compliance with the provisions of this act. Such rate so ascertained, determined and fixed by the commission shall be charged, enforced, collected and observed by the public utility for the period of time fixed by the commission." (Emphasis supplied.)

Section 37–3–101, W.S.1977 provides:

"All rates shall be just and reasonable, and all *unjust* and *unreasonable rates* are prohibited. No public utility shall directly or indirectly by any device whatsoever, or in anywise, charge, demand, collect or receive from any person a greater or less or different compensation for any service rendered or to be rendered by such public utility than is charged, demanded, collected or received by such public utility from any other person for a like and contemporaneous service under similar circumstances and conditions." (Emphasis supplied.)

Section 37–3–104, W.S.1977 provides:

"No public utility as to rates shall make or grant any *undue* or *unreasonable* preference or advantage to any person, locality or particular description of service, or subject any person, locality, or particular description of service to any *undue* or *unreasonable* prejudice or disadvantage. *This shall not, however, be construed as prohibiting a public utility from establishing a sliding scale of charges or classification of service; provided, that such classification is not discriminatory between customers in the same class of business.*" (Emphasis supplied.)

■ Whether or not a rate is "undue" or "unreasonable" or "unjust" is a question of fact to be determined by the PSC. *Pennsylvania Company v. United States*, 236 U.S. 351, 35 S.Ct. 370, 59 L.Ed. 616 (1915);

and *Interstate Commerce Commission v. Martin Brothers Box Company*, 9 Cir. 1955, 219 F.2d 811, cert. denied 350 U.S. 823, 76 S.Ct. 50, 100 L.Ed. 735 (1955).

■ We recently noted that rates must be fair, reasonable, uniform and not unduly discriminatory; that if the rates meet these requirements, discretion in fixing the rates was properly exercised; and that classification of users for the purpose of fixing rates is permissible if reasonable and if based on such factors as quantity received, type of service, time of use, cost of service, etc. *Laramie Citizens for Good Government v. City of Laramie*, Wyo., 617 P.2d 474 (1980). Appellant acknowledges the propriety of classifying customer service; that the rates for all classes need not be the same; and that the mere fact that rates are different does not, of itself, reflect unfair discrimination or preferential treatment. Such is established law. See last sentence of § 37–3–104, supra; *United States Steel Corporation v. Commonwealth Public Utility Commission*, 37 Pa.Cmwlth. 195, 390 A.2d 849 (1978); *Application of Boise Water Corporation*, 82 Idaho 81, 349 P.2d 711 (1960). Classification based upon quantity of gas used does not necessarily establish unreasonable discrimination. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa.Super. 376, 126 A.2d 777 (1956); *Bilton Machine Tool Co. v. United Illuminating Co.*, 110 Conn. 417, 148 A. 337 (1930). Classification can be based upon the purpose for which the commodity is used. *Midwest Association of Automatic Laundry Stores v. The Peoples Gas Light and Coke Company*, 82 P.U.R.3d 246 (Ill.1970).

But appellant contends the distinction or discrimination is unreasonable when the rate of return or profitability from one classification is disproportionate to that from another classification. Certainly, this is a proper consideration in forming a rate structure. Cost of service is an important economic factor to any utility. There is generally less cost to serve an industrial user of a large volume of gas than there is to serve several customers, each using a small amount of gas. The cost of additional lines and laterals for service to the small customers, by itself, makes for increased cost without reference to the difference in costs for maintenance, accounting, etc. Although costs of service is not the only factor to be considered in fixing rates or rate structures, we note that, with respect to natural gas, it has acquired another element. When gas was in abundant supply—often "flared" and treated as a by-product, the service to large industrial users at reduced prices was a desirable adjunct to the maintenance of service to residential customers. The scarcity of the present supply has not only greatly reduced this desirability and has enhanced the importance of factors other than cost of service in measuring the reasonableness and preferential nature of a rate structure, but it has also made the increased cost of needed gas a "cost of service" in itself to the class of customers necessitating the acquisition of the new expensive gas.

■ Gas from new sources costs more than does that from old sources.[3] The need to obtain gas from new sources is engendered by the demand of industrial users. For this reason, MDU's rate structure places the cost of acquiring the new gas, i. e., cost of service, primarily on the industrial user.[4] Appellant's contention that the cost of service should be the only basis for a rate structure would, thus, support the result reached by the PSC in this case.

This follows when proper recognition is given to the fact that the use of gas for heat in residences, hospitals, schools, small commercial business locations and similar places has a higher priority than use for industrial purposes such as boiler fuel. The Natural Gas Policy Act of 1978, 15 U.S.C.S.

---

**3.** The evidence reflected that the present cost of new gas was $1.51 Mcf, and that the price was set pursuant to "Federal Energy Regulatory Commission Orders and Dockets 77–0, 77–A, and 142–A, B, and C."

**4.** Residential use would here require purchase of some gas from new sources, but the bulk of the purchase thereof is to supply low priority users rather than stop service to them.

§ 3311, et seq. gives recognition to such in its incremental pricing. The fact that industrial tariffs generally are, and have been, based on interruptible use [5] gives recognition to such. Evidence in this case was to the effect that MDU's

> " \* \* \* system was built on the premise of serving residential and small commercial customers. We did in the past serve industrial customers because we had the gas, but if we continue to service industrial customers we must find new sources of gas, which will cost us at least $1.50."

The purchase by MDU of expensive new gas was primarily to serve the industrial user. The average Wyoming residential consumer uses 156 Mcf per year. Appellant used 555,686 Mcf in 1977 in its Lovell plant. The industrial user can reasonably, justly and fairly be required to bear the additional "cost of service" to it, i. e., the cost of gas purchased to serve it. Giving consideration to priorities, a rate for industrial users based on replacement cost of gas and not on the average cost of gas is not unduly discriminatory.

But we do not rest our affirmance on such reasoning alone. Factors other than cost of service are proper considerations for the PSC in establishing rate structures and rates. *Laramie Citizens for Good Government v. City of Laramie, supra*; *City of Kermit v. Rush*, Tex.Civ.App., 351 S.W.2d 598 (1961). Priority for use established on a reasonable basis has already been indicated as a proper consideration. The factors set forth in PSC's Finding of Fact No. 25, supra, are proper considerations in an appropriate situation. We will not set a formula to be applied by the PSC in establishing a rate structure or in setting rates.

> " ' \* \* \* Rate structure, which is an essential, integral component of rate-making, is not merely a mathematical exercise applying theoretical principles. Rate structure must be based on the hard economic facts of life and a complete and thorough knowledge and understanding of all the facts and circumstances which affect rates and services; and the rates must be designed to furnish the most efficient and satisfactory service at the lowest reasonable price for the greatest number of customers, i. e., the public generally.' " *United States Steel Corporation v. Pennsylvania Public Utility Commission*, 37 Pa.Cmwlth. 173, 390 A.2d 865, 873 (1978).

> "Commission is not bound by a single formula or a combination of formulas in fixing rates and none is exclusive or more favored than the others. *Lone Star Gas Company v. Corporation Commission*, 170 Okl. 292, 39 P.2d 547 (1935). There is no precise statutory or court announced basis for determining the justness or reasonableness of class rate level structures or relationships, the Court generally holding that rate making is the responsibility of a regulatory commission effectively exercising its discretion upon sufficient evidence before it. [Citation.]" *Application of Arkansas Louisiana Gas Company*, Okl., 558 P.2d 376, 379 (1976).

Other states have recognized the applicability of factors other than cost of service in the rate-making process, i. e., in determination of rate base, rate of return, rate structure, fixing of rates, etc.:

> "The commission has considered all of the evidence relative to rate design and concludes that the company should be directed to file a new schedule of rates placing more emphasis upon commercial and industrial rates than upon residential. Commercial and industrial customers are allowed income tax credits which materially reduce the effect of higher gas rates

---

**5.** The following provision of MDU's industrial use tariffs is typical of that found in such tariffs:

> "Deliveries of gas under this schedule shall be subject at all times to the prior demands of domestic and small commercial customers, and the Company shall have the right to interrupt deliveries to customers under this schedule without being required to give previous notice of intention so to interrupt whenever, in its judgment, it may be necessary to do so to protect the interest of those customers whose demands are hereby given preference."

by as much as 48 per cent, or nearly half, in most cases. Residential customers do not enjoy this advantage and must shoulder the entire burden of higher gas rates. We are sympathetic with the burden placed upon residential users of utility service and feel that whatever relief is reasonable should be granted. Another point is that natural gas has become a valuable natural asset which is in increasingly short supply accompanied with increasingly greater demand. To that end use of natural gas in its most advantageous form should be encouraged. It may well be that curtailments or restrictions will be placed upon the use of natural gas in situations where a less critical fuel could be used. We are of the opinion that residential use effects the most advantageous use in the current situation, and until natural gas becomes abundant and any demand and use can be supplied, we will encourage residential use. * * * "
*Re Columbia Gas of Maryland, Inc.*, 93 P.U.R.3d 1, 12 (Md.1972).

In *Application of Arkansas Louisiana Gas Company*, supra, 558 P.2d at 378–379, the court affirmed the Corporation Commission's order fixing rates on other than cost of service:

" * * * [T]here appears to be essentially three reasons for adjusting rate structures to shift substantial portions of the rate increase to industrial and high volume customers: (1) a shift from traditionally accepted criteria for valuing utility service known as the 'cost of service' rational [sic] to an 'intrinsic value' of service rational [sic], (2) a desire to protect residential rate payers from absorbing more than a fair proportional share of the rate increase, and (3) a desire to channel greater quantities of an admittedly dwindling resource to 'human needs' uses such as home heating, hospitals, nursing homes, etc., thereby discouraging inefficient and wasteful over consumption of natural gas reserves where alternative fuels can be substituted.

> \*     \*     \*     \*     \*     \*

"Commission, in its order, expressed substantial dissatisfaction with the cost of service rational [sic] and was of the opinion that cost of service no longer reflected economic realities as to the true value of service to the customers. Preference was set forth for what Commission termed the 'intrinsic value' of service. Commission premises its intrinsic value rational [sic] on the theory that each unit of natural gas has the same energy value and the same economic value no matter how many units of gas a customer may purchase.

"On at least one prior occasion, this Court has had cause to consider some aspects of Commission's shift in emphasis from cost of service to intrinsic value of service. *Arkansas Louisiana Gas. Co. v. Sun Oil Co. of Pennsylvania*, supra [Okl., 554 P.2d 14 (1976)]. Therein Sun Oil argued the rates adopted by Commission were discriminatory as to it, a high volume industrial consumer, for the reason that cost of service was not given controlling effect. We recognized that Commission had rejected cost of service as the controlling principle in arriving at a rate structure. However, we specifically noted that the order applied both principles [cost of service and intrinsic value] in arriving at a fair rate structure. We upheld that order."

" ' "There is no requirement that rates for different classes of service must be either uniform or equal or that they must be equally profitable. Differences in rates between classes of customers based on such criteria as the quantity of electricity used, the nature of the use, the time of the use, the pattern of the use, or based on differences of conditions of service, or cost of service are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation. * * * " ' "
*United States Steel Corporation v. Pennsylvania Public Utility Commission*, supra, 390 A.2d at 873.

Finally with reference to the distinction or discrimination in the rating structure and rates, we point out that that which

here results in favor of residential users versus industrial users in connection with the rate of return results in favor of the industrial users in connection with the actual price paid for the gas and in connection with the actual percentage increase thereof. The tariff prior to the application for increase in rates provided a four-step schedule for residential users with a rate of from $1.6128 per Mcf for the first 6000 cu. ft. used per month, to $1.0888 per Mcf for cu. ft. over 60,000 used per month, whereas the flat rate for industrial users was $1.2387 per Mcf at 14.73 psia. The application requested a change to a two-step schedule for residential users with a rate of $1.7534 per Mcf for the first 10 Mcf's used per month and $1.55 per Mcf for Mcf's over 10 Mcf's used per month. (The average cost to a user would be $1.62 per Mcf.) It requested a change for industrial users to a flat rate of $1.50 per Mcf at 14.73 psia. The rates set forth in the application would cause a 21.1 percent increase for the industrial user as compared to a 24 percent increase for the residential user.

The rate structure approved in this matter by the PSC is not unfairly discriminatory to appellant, and it does not create an undue, unjust or unreasonable preference in violation of §§ 37–2–121, 37–3–101, or 37–3–104, W.S.1977.

## CONSTITUTIONAL DUE PROCESS AND EQUAL PROTECTION RIGHTS OF INDUSTRIAL USERS

Appellant argues that it was denied due process of law in that the rate structure approved by the PSC "places such a disproportionate burden upon industrial customers without evidentiary support." It further argues that it was denied equal protection of the law in that there was a "lack of evidentiary support" for the classification here made by the PSC and that there was not a substantial distinction upon which the classification was based.

The issue relative to sufficiency of the evidence is treated in the next section of this opinion. In it, we confirm the existence of adequate evidence for the PSC's

Findings of Fact and Conclusions of Law. Appellant's argument would then appear to be without its premise.

■ In any event, appellant cannot properly contend that it was denied procedural due process of law. The hearing was lengthy. Appellant cross-examined witnesses and presented evidence in its behalf. Nor does appellant seek to obtain a declaration that *the legislative acts* pertaining to the matter are unconstitutional and therefore it was denied substantive due process of law. Rather, appellant argues that the PSC did not exercise its discretion in accordance with "ascertainable standards" and that its decision was arbitrary and according to whim and caprice. We do not find it to be so.

We have previously indicated the propriety of establishing priorities for gas service and the rationale for setting a priority for residential users over that of industrial users. We also noted that practicality in requiring payment by a class of users for increased cost occasioned by such class. "Ascertainable standards" are present. The PSC action was reasoned and taken in full consideration of the facts and circumstances of the situation.

" '[A]rbitrary and capricious action' on the part of an administrative agency is wilful and unreasoning action, without consideration and in disregard of facts and circumstances." *Marathon Oil Company v. Pan American Petroleum Corporation*, Wyo., 473 P.2d 575, 577 (1970).

■ We have already referred to appellant's acknowledgment of the propriety of classifying customer service and that rates for all classes need not be the same. Yet it contends that a reasonable basis for the classification has not been established and, thus, it is denied equal protection of the law. We can only, again, point to the practical and functional difference between the gas service to industrial users and that to residential users; and we can call attention to the fact that if appellant's contention that there is unlawful inequality between the two classes, then appellant should be

paying the higher rate for gas as now being paid by residential users.

## SUFFICIENCY OF THE EVIDENCE

The last three issues presented to us by appellant have to do with the sufficiency of the evidence to support (1) the finding that the rate structure was appropriate, (2) the rate increase awarded to MDU [6], and (3) the finding that an increase in excess of the amount testified to by one of MDU's witnesses was justified.

We recently detailed the standard for our review of agency action, noting that we would review the "whole record" to determine whether or not the agency could reasonably have made its findings and order upon all of the evidence before it. If it could, we would not substitute our judgment for that of the agency. *Board of Trustees of School District No. 4 v. Colwell*, Wyo., 611 P.2d 427 (1980).

A review of the whole record reflects that evidence, in the form of testimony and exhibits, was presented and received to support the findings of fact and conclusions of law made by the PSC. The evidence usual to a rate-making case was in the record—that relative to used and useful property, cost figures, etc., to establish a rate base; that relative to cost of money, attraction of equity capital, etc., to establish a rate of return; that relative to current test year and reasonably anticipated operating revenues and expenses; and that relative to the proposed rate structure.

There was evidence as to the availability, amount and source of natural gas supplies, and to the changes therein. There was evidence of the cost to MDU for natural gas and that the cost of new gas exceeded that of the old gas, with the new gas cost being at least $1.50 per Mcf. There was evidence of the amount of gas used by MDU's customers, including that used by appellant and by residential customers. There was evidence of the increased demand for the use of such gas by each class of such users. There was evidence as to the purpose for which the customers used the gas. There was evidence of the rates then charged and proposed to be charged to the industrial users and to the residential users. As in all rate-making cases, much of the evidence is in exhibits which require careful analysis.

On the basis of such evidence, the findings and conclusions of the PSC were reasonable.

Appellant makes specific references to some areas in which it contends there was an insufficiency of evidence for the findings or conclusions reached by the PSC. It states:

"* * * There is no logical basis for concluding that industrial customers should be relegated to a position of secondary importance to all users. In fact, there is no evidence in the record to suggest that this is the case. * * *"

We previously noted the historical basis for furnishing gas to industrial users, i. e., to accommodate a surplus of often wasted gas. We also noted the interruptible nature of service to them, the purpose of this use as being for boiler operation as distinguished from heating and similar use, and the fact that MDU's existence was for the purpose of serving residential customers. We noted the fact that industrial rates were in truth more favorable than residential rates from the standpoint of actual cost and that the percentage of residential increase was less for industrial users. There was support in the record for all of this. The classification of industrial users separately from residential users is reasonable and fair.

Appellant questions the figure used by PSC as an appropriate cost of gas for rate-making purposes. The figure used by PSC was the third-quarter cost and the most recent. It was reasonable to use this figure rather than the second-quarter cost as urged by appellant.

6. Inasmuch as this appeal is from affirmance by the district court of a PSC order directing MDU to file tariffs reflecting the authorized rate increase, the actual rates as increased are not of record. However, the PSC order set the amount ($816,988) of authorized increase in the annual return to MDU which was to be reflected in the tariff rates to be filed by MDU.

As a finding or conclusion not supported by the evidence, appellant points to a statement of one of MDU's witnesses to the effect that the required annual additional revenue was $654,317 on the basis of $0.904255 as average cost of gas, whereas the amount authorized by the PSC was $816,988. The witness' statement was made in connection with a question concerning a change which would result in an exhibit if certain anticipated Montana gas were not actually received. The gas was not received. In this connection, the witness was also asked the following question and he gave the following answer:

"Q. Would that mean you are amending Exhibit L–1, you are amending your revenue requirement?

"A. No, sir. I'm responding to questions, and I'm suggesting to the Commission that, in view of the tracking increase adjustments which we quarterly make, it won't make any difference.

"I would recommend to this Commission, if I may, that they give full consideration of an average cost of gas for rate-making purposes of a dollar oh nine four six, because when the Montana Power contract is finally approved and we start taking that, then that would be a proper figure for use in establishing rates in Wyoming."

In any event, the PSC figured the cost of gas on the basis of the third-quarter 1978 cost to MDU. After adjustment for pass-on, the cost was figured at $0.976657 per Mcf. The exhibits in the record fully support these calculations.

■ Appellant questions the existence of evidence to support the "volumetric approach" in determining the amount of authorized annual increase. Although this approach was not presented by MDU, the PSC staff intervened in the proceeding and suggested this approach, presenting considerable evidence in support thereof. The PSC is not limited to consider only the applicant's evidence. Staff exhibits 24 and 25 reflect net operating income to be $219,930 after designated adjustments and pass-on receipts. Subtracting this figure from the needed operating income figure of $644,764 (9.5 percent rate of return on the rate base of $6,786,791) leaves $424,834 as a revenue requirement before taxes. By adding to it the federal and state tax requirements of $392,154, the amount authorized by the PSC ($816,988) is obtained. The exhibits were in evidence and subject to cross-examination.

■ Although we can find adequate support in the record (consisting of numerous exhibits and a 1238-page transcript) for the PSC's findings and conclusions, we point out that the PSC brings to its consideration of this and similar matters an accumulated experience and expertise which fortifies its judgment. *Federal Trade Commission v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010, reh. denied 334 U.S. 839, 68 S.Ct. 1492, 92 L.Ed. 1764 (1948); and *Simeon Management Corporation v. Federal Trade Commission*, 9 Cir. 1978, 579 F.2d 1137.

Affirmed.