NORTHLAND NAVIGATION COMPANY, INC., Respondent, *v.* AMERICAN MERCHANT MARINE INSURANCE COMPANY OF NEW YORK, Appellant.

First Department, December 4, 1925.

Insurance — marine insurance — action on valued policy of marine insurance — policy contained provision that steamship was to sail within ten days from June 20, 1919 — steamship at time insurance was issued was laid up for repairs at Paramaribo — said statement in policy as to date of sailing constituted warranty — evidence shows that steamship did not sail within ten days — part of goods were removed from steamship before it burned — plaintiff had burden of showing value of goods removed and saved.

A clause in a valued policy of marine insurance issued to the plaintiff while its steamship was in the harbor of Paramaribo undergoing repairs which states " To be insured, lost or not lost, at and from Paramaribo to Rio de Janeiro, but to sail within ten (10) days from June 20th, 1919," constitutes a warranty that the steamship would sail within ten days from that date.

**572** Northland Nav. Co., Inc., *v.* Amer. Merchant M. Ins. Co.

. First Department, December, 1925. [Vol. 214

The verdict of the jury to the effect that the steamship did sail within that time is contrary to the weight of the evidence for, while a steamship may be said to have sailed as soon as it leaves port, with the intention of starting out on its journey, no matter how far it proceeds, still the weight of the evidence is to the effect that the steamship did not actually leave the port of Paramaribo until after the 1st of July. 1919, or more than ten days after the 20th of June, 1919.

Although this is a valued policy under which proof of value of the loss sustained by the plaintiff is not necessary, where there is a total loss, still the plaintiff is required in this case, there being only a partial loss, to prove the value of the goods taken from the steamship and saved before the fire which destroyed the boat and the remaining cargo.

Clarke, P. J., dissents in part.

Appeal by the defendant, American Merchant Marine Insurance Company of New York, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 11th day of November, 1924, upon the verdict of a jury, and also from an order entered in said clerk's office on the 13th day of November, 1924, denying defendant's motion for a new trial made upon the minutes.

*Bigham, Englar & Jones* [*D. Roger Englar* of counsel; *Henry B. Potter* and *M. P. Detels* with him on the brief], for the appellant.

*Engel Brothers* [*Jacob B. Engel* of counsel; *Joseph G. Engel* with him on the brief], for the respondent.

Dowling, J.:

This action was brought to recover the sum of $45,000, with interest, on a valued policy of marine insurance issued by defendant to plaintiff covering losses on the steamship *Mohegan*, as noted below. This policy dated June 27, 1919, contained the following provisions among others:

" On disbursements and /or salvage or other charges and /or liabilities in respect of general average valued at $45,000.

" Free from all average but to pay the deficiency arising from loss, damage, salvage, and charges caused by perils insured against such deficiency being the difference between the net value of the property which arrives at destination and the amount of the disbursements, etc., hereby insured. * * *

" This risk to commence from the time the disbursements, etc., are paid, or liability to pay is incurred until 30 days after safe arrival at destination, the seaworthiness of the vessel being admitted."

" To be insured, lost or not lost, at and from Paramaribo to Rio de Janeiro, but to sail within ten (10) days from June 20th, 1919. * * *

" Held covered in case of any breach of warranty as to cargo,

trade, locality or date of sailing, provided notice be given and any additional premium required be agreed immediately after receipt of advices of breach or proposed breach by owners."

The following facts are undisputed: The steamship *Mohegan*, owned by the plaintiff, left the port of New York on or about the 3d day of February, 1919, with a general cargo, bound for Rio de Janeiro and Bahia, Brazil. Before leaving New York she had arranged to call at Barbadoes for the purpose of coaling. The ship reached Barbadoes in due course and after coaling, left that port, bound for Rio de Janeiro. On this voyage the ship met with such heavy weather, high seas and gales, and was so damaged thereby that she had to put in at Paramaribo, Dutch Guinea. She reached that port on February 24, 1919. At the port of Paramaribo repairs to the vessel were made as ordered by the marine surveyor. While engaged in making these repairs plaintiff paid out and incurred liability for large sums of money for unloading and reloading the cargo, storing it in warehouses, maintenance of officers and crew, returning a large part of the crew and some of its officers to New York port, and for charges, coal and other necessary expenses. These charges and disbursements, under maritime law, became a lien on the cargo enforcible as such as a condition of delivery of the cargo to its respective owners at the port of destination. While the *Mohegan* was at the port of Paramaribo, the defendant delivered its insurance policy to plaintiff, whereby defendant insured the plaintiff in the sum of $45,000 on the aforesaid lien and interest of the plaintiff in the steamship *Mohegan* and the cargo against loss by fire.

The charges and disbursements hereinbefore referred to constituted proper " general average charges " and a lien on the cargo on board of the steamship, payable to plaintiff from the cargo or its owners on the safe arrival of the cargo at the point of destination. The insurance in question covered such " general average."

The *Mohegan* left Paramaribo on the voyage to Rio de Janeiro on a date which is one of the disputed questions of fact in the case, plaintiff claiming it started its trip there on June thirtieth, but met with a mishap to her steering gear which forced her to return, the same occurring again on the following day, and the vessel finally sailing for Rio de Janeiro on July third; the defendant claiming that the steamship did not sail from Paramaribo until July third, and never was ready to sail before that date.

The *Mohegan* arrived at Rio de Janeiro on July 31, 1919. On August nineteenth she went alongside the dock and after some cargo had been discharged, an explosion took place and the ship and the cargo remaining therein were burned to the water's edge.

**574** Northland Nav. Co., Inc., *v.* Amer. Merchant M. Ins. Co.

First Department, December, 1925. [Vol. 214

As a result plaintiff claims the lien for general average valued at $45,000 was wholly lost. Due notice of the loss was given to the defendant and payment was demanded, which was refused.

The captain of the *Mohegan* testified that the vessel was lying in the harbor on the morning of the nineteenth, waiting for permission to come alongside a dock and get a place to unload, which was finally accomplished about ten o'clock, and that " after taking out six or seven slings, as I am told by men that were there, there was a heavy explosion causing a fire." The captain testified he was not there when the men started to discharge cargo, and he only knew what his officers and men told him, and did not know personally how much cargo was taken out of her.

The questions involved on this appeal are:

(1) Was there a breach of the warranty that the vessel would sail from Paramaribo within ten days from June 20, 1919, and was the implied finding of the jury that there had been no such breach warranted by the testimony?

(2) Was there a total loss within the meaning of the policy, so as to excuse the plaintiff, this being a valued policy, from proof of the actual loss sustained?

There was a subsidiary defense of unseaworthiness at the time of the departure from New York, thus making the expenses incurred at Paramaribo not those of a general average nature; but the finding of the jury against defendant upon this point is not pressed upon this appeal.

As to the first question, the meaning of the expression " to sail " is well settled by judicial construction. In 26 Cyc. 639, the general rule as gathered from the authorities, is thus stated: " A warranty ' to sail ' on a particular day requires that the vessel be got under way in complete readiness for the voyage with the purpose of proceeding thereon without further delay at the port of departure. If it is intended or is necessary that the vessel stop for any purpose before proceeding to sea, she has not sailed within the meaning of the warranty. But if after breaking ground in complete readiness and with intent to proceed, the vessel is detained by some unforeseen cause, the warranty is complied with. An unforeseen cause preventing a vessel from commencing the voyage at the time named does not excuse the non-compliance with the warranty."

In *Pittegrew* v. *Pringle* (3 B. & Ad. 514) Lord Tenterden, C. J., said: " The general principle of the decisions is this; that if a ship quits her moorings and removes, though only to a short distance, being perfectly ready to proceed upon her voyage, and is by some subsequent occurrence detained, that is nevertheless a sailing; but it is otherwise, if, at the time when she quits her moorings and

hoists her sails, she is not in a condition for completing her sea voyage."

In *Union Insurance Co.* v. *Tysen* (3 Hill, 118) Mr. Justice COWEN said of the difference between departure and sailing (at p. 126): "Departure is a word of different meaning. It imports an effectually leaving of the place behind. If the vessel be detained or driven back, though she may have sailed, there is no departure. (*Moir* v. *The Royal Exchange Assurance Company*, 6 Taunt. 241; 4 Camp. 84, S. C., 3 Maule & Selw. 461, S. C.)   *   *   *

"In short, the least locomotion with readiness of equipment and clearance satisfies a warranty to sail."

In *Roelandts* v. *Harrison* (23 L. J. Ex. 169, 173) Baron PARKE defined a sailing as: "That period of time when the vessel breaks ground, being at that time fully fit for sea, having the cargo on board which she intends to carry, with a competent crew, and having permission to leave by having the Custom House clearances on board."

In the case now under consideration, I am satisfied that the preponderance of the evidence establishes that the vessel did not sail, and was not ready to sail from Paramaribo within ten days from June 20, 1919. While the captain of the vessel claims that his loading was completed at about two o'clock on June thirtieth, he further testified: "Q. Now at two o'clock on June thirtieth, what did you do? A. I threw off my lines, got the engines going ahead a little, and got ahead about twenty feet or more, and away from the dock and finding that she would not answer her helm, I knowed there was something wrong with her steering gear, and I stopped my engine and the current sent the ship back on to the dock. Q. At ten o'clock in the morning, when you found, as you said, that you were ready to sail, had you applied for clearance? A. I had. Q. What did you do? Just tell us what you did in regard to that? What is the usual practice, and what did you do? A. At ten o'clock in the morning I went up to the agent and got the money; went down to the Consul and paid my bill there, about ten, twenty or thirty. Q. Did you pay all the port charges? A. From there I went to the Custom House and paid my bill there. At the same time I notified the authorities there that the agent would be down there for my clearance papers some time during the afternoon. Q. Where had you intended going to get your clearance papers after you had started? A. I intended to go out in the stream and anchor and wait for the papers." This testimony would seem to indicate that on June thirtieth the vessel was not about to sail on her voyage, but was merely pulling out into the stream to go to an anchorage in the harbor to await her clearance

papers, without which she could not sail and which she had not yet received.

He also testified that his vessel again left her dock on the following day, July first, at about the same hour and again found the steering gear out of order, so the vessel anchored in the stream and repaired the steering gear and finally sailed on her voyage on July third; that the pilot came aboard for the first time on June thirtieth, but went ashore after the vessel put back to the dock; he again came aboard on the first and again went ashore, and finally came aboard again on July third and took the vessel out.

The protest executed by the master and others of the officers of the vessel before the United States Consul at Rio de Janeiro on August 2, 1919, set forth among other things: " Ship finished loading July 1st, 1919, and proceeded on her way to Rio de Janeiro on July 3, 1919, encountering heavy gales on the voyage and was not able to make Rio de Janeiro and was compelled to call at Bahia for bunkers."

The master seeks to explain this contradictory statement by saying it refers not to the original loading of cargo but to the reloading some whose removal had been necessitated by the repairs.

The third mate of the *Mohegan*, testifying for defendant, testified that the loading of the vessel was not completed until July first; that she never left her dock at Paramaribo until July second, and that on that day her steering gear broke, but that none of the cargo was taken off.

The chief engineer of the *Mohegan*, testifying for defendant, corroborated the preceding witness as to the loading being completed on July first, and that she did not cast off her lines until July second, on which day, after leaving dock, her steering gear broke; and that no cargo ever was taken off. He said that after pulling out into the stream her steering gear broke and she came to anchor, but never returned again to the dock.

The deposition of the comptroller of customs at Paramaribo showed that no vessel was permitted to sail from that port without clearance papers, which were obtained for the *Mohegan* only on July first, and there was no entry in the register before that date in regard to her clearance.

The pilot who took the *Mohegan* out and who was a licensed government pilot, gave his testimony also by deposition. He swore that he piloted the *Mohegan* out of Paramaribo on July third; that no one had applied to him to pilot her out until July second at four P. M.; and his testimony was based on the written records he kept of every ship he was engaged to pilot in or out of the harbor.

Upon this testimony it seems to me that plaintiff failed to prove that the vessel had sailed from Paramaribo on June thirtieth (as alleged in the complaint herein) within the meaning of the policy and that the implied finding of the jury to that effect was against the weight of the evidence.

The provision in the policy that the *Mohegan* should sail from the port of Paramaribo within ten days from June 20, 1919, constituted a warranty. The rule applicable to the case is thus laid down in Arnould on Marine Insurance and Average (11th ed. § 630):

" No particular form of words is requisite to constitute an express warranty; it may be in any form of words from which an intention to warrant can be inferred. The word ' warranty ' or ' warranted,' for instance, is in no case necessary. The words ' to sail on such a day,' or ' in port,' or ' all well ' on such a day, or ' carrying so many guns and so many men,' etc., if written in the body, at the foot, or on the margin of the policy, would amount to an express warranty as much as any formal clause. Similarly a clause in a floating policy, ' declarations of interest to be made * * * as soon as possible after sailing of vessel to which interest attaches ' has been held by the Privy Council to be a warranty, not merely a collateral stipulation the breach of which would only found a claim for damages.

" In some cases, indeed, it is not even requisite that there should be any explicit clause of warranty at all; for instance, the mere description in the policy of the thing insured as being of a certain nation, as ' a Danish brig,' ' the Swedish ship " Sophia," ' etc., will amount to an express warranty that the thing insured has the national character thus ascribed to it in the policy. Thus, where a policy was effected on goods ' on board the " Mount Vernon," an American ship,' it was held that this description of the ship contained a warranty that she was an American ship, and therefore induced a necessity of her being documented as American ships were bound to be by the treaties then subsisting between the United States and France."

The second objection has reference to plaintiff's failure to prove the value of the cargo removed from the vessel before the fire broke out on board, or that the cargo so removed was also destroyed in the fire. The provisions of the policy are as follows:

" S. S. ' MOHEGAN '

" Salvage Association's Clause

" On Disbursements and/or salvage or other charges and/or liabilities in respect of general average valued at $45,000.

" Free from all average but to pay the deficiency arising from loss, damage, salvage and charges caused by perils insured against such deficiency being the difference between the net value of the property which arrives at destination and the amount of the disbursements, etc., hereby insured.

" For the purpose of ascertaining the net arrived value of the property there shall be deducted all disbursements salvage or other charges for which the property and/or the Underwriters thereon are liable (except so far as they are included in this insurance) whether incurred in connection with the original or any subsequent accident or occurrence.

" The disbursements, etc., applicable respectively to ship, freight, cargo, or Ship-owners and on deck load (if any) to be considered as if separately insured."

It is true that this is a valued policy, which would dispense with proof of the value of the loss sustained by plaintiff. (*Sturm v. Atlantic Mutual Ins. Co.*, 63 N. Y. 77; *North of England Ins. Assn. v. Armstrong*, L. R. 5 Q. B. 244; *Williams v. Continental Ins. Co.*, 24 Fed. 767.) But this rule, which applies to a total loss and obviates proof of the actual damage sustained, does not apply where concededly a part of the property insured was saved from the general disaster. The language of the policy obviated any requirement that plaintiff should prove the details or items of its general average disbursements. But it did not relieve it from the proof of the value of what cargo was saved from the fire. The master conceded that six or seven slings of cargo had been removed, but there is no proof of what it consisted of, what its value was, or whether it was destroyed in the fire following the explosion or remained safely on the dock.

For this reason, it seems to me that the implied verdict of the jury that there was a total loss, is without evidence to support it. In fact, what evidence there is, is to the contrary.

It follows that the judgment and order appealed from should be reversed and a new trial ordered, with costs to the appellant to abide the event.

Merrell, McAvoy and Martin, JJ., concur; Clarke, P. J., concurs only on the ground that the finding that the ship sailed from Paramaribo within the time limited was against the weight of evidence.

Judgment and order reversed and new trial ordered, with costs to appellant to abide the event.