ARCHIBALD McNEIL & SONS CO., Inc., OF NEW YORK, v. WESTERN MARYLAND RY. CO.

No. 1538.

District Court, M. D. Pennsylvania.

July 29, 1930.

George Demming, of Philadelphia, Pa., and John R. Geyer and Paul G. Smith, both of Harrisburg, Pa., for plaintiff.

Spencer G. Nauman, of Harrisburg, Pa., and George Cochran Doub and Morton K. Rothschild, both of Baltimore, Md., for defendant.

WATSON, District Judge.

This is an action in trespass brought in the year 1923 by the Archibald McNeil & Sons Company, Inc., of New York, plaintiff, against the Western Maryland Railway Com-

pany, defendant, to recover damages for an alleged unreasonable preference or discrimination in violation of sections 3, 8, and 9 of the Act of Congress of February 4, 1887, 24 Stat. 379, now known, with amendments, as the Interstate Commerce Act (49 USCA §§ 3, 8, 9). The jurisdiction of the court arises under said act of Congress and by reason of the amount in controversy and diversity of citizenship of the parties.

The plaintiff claims that in July, 1921, when it was in the business of exporting coal, it chartered a steamship called the Winston Salem; that the defendant refused to berth and load the Winston Salem on July 5, 1921, at the coal pier of the defendant at Port Covington, Md., in the order of its arrival as registered at the pier office, but did berth and load the Newton, a steamship chartered by other shippers and having a later registered arrival, in the turn rightfully belonging to the Winston Salem; that the Winston Salem was registered at defendant's coal pier at 10:50 a. m. July 2, 1921; that the Newton was registered at 5:00 p. m. July 2, 1921; that the Newton was berthed for loading at 5:05 p. m. July 5, 1921; and that the Winston Salem was not berthed for loading until July 6, 1921.

The plaintiff further alleges it had sold for delivery in Venice, Italy, by ship sailing July 5, 1921, a full cargo of coal amounting to 7,981⁹⁄₂₀ gross tons for the sum of $110,-456.87; that, because of the delay in docking the Winston Salem, and the failing of the Winston Salem to sail with the cargo of coal on July 5, 1921, the purchasers of the cargo of coal refused to accept and pay for the same; that the plaintiff sold the cargo of coal in Italy at the best market price obtainable, and received therefor the sum of $74,-000; and that it is now entitled to recover from the defendant the difference or loss amounting to $36,456.87, with interest and counsel fees.

The defendant contends that the preference was not undue or unreasonable; that the substitution of the Newton for the Winston Salem was not the proximate cause in the delay of the sailing of the Winston Salem, and advances other reasons why the plaintiff is not entitled to recover.

The case was tried without the intervention of a jury, the attorneys of record having agreed to waive a jury by a stipulation in writing filed with the clerk.

From the evidence, the court finds the following facts:

1. (a) The plaintiff, the Archibald McNeil & Sons Company, Inc., of New York, was, at the time this suit was brought, a corporation of the state of New York.

(b) The defendant, the Western Maryland Railway Company, was, at the time this suit was brought, a corporation of the state of Maryland and Pennsylvania, and was a common carrier engaged in interstate transportation.

2. The defendant owned and operated a coal pier at Port Covington, Baltimore, Md.

3. Paragraph 3 of defendant's rules governing the precedence of vessels in loading coal or coke at Port Covington reads as follows:

"3. Vessels will take their turn in loading at suitable chutes at the pier in the order of their arrival, as registered at the pier office, except as provided in these rules.

"A vessel, owing to size or other conditions, not suited to an unoccupied berth, shall not take its turn until suitable berth can be provided.

"As between a steamer and other vessel arriving on the same date, the steamer shall take precedence, provided it is ready to cargo, and cargo is on hand."

4. (a) The steamship Winston Salem, chartered by the plaintiff, was registered at the Port Covington pier office at 10:50 a. m. July 2, 1921.

(b) The steamship Newton, chartered by the New England Coal & Coke Company, was registered at the Port Covington pier office at 5:00 p. m. July 2, 1921. The New England Coal & Coke Company was a competitor of the plaintiff.

5. (a) On July 2, 1921, after the time when the Winston Salem had been registered, the steamship Joss Issifoglu was loading at Port Covington pier, and sailed from the pier at 7:45 a. m. on July 3d.

(b) The steamship Emlynian docked at Port Covington pier at 8:45 a. m. on July 3d, and was loaded and sailed from the pier at 4:00 p. m. July 5th.

(c) No loading was done at the Port Covington pier July 4th, that day being a national holiday.

6. When the Emlynian sailed from the pier at 4:00 p. m. July 5th, there were waiting in the stream for cargo the steamship Winston Salem, the steamship Newton, the steamship Terrier, the steamship Herakles, and the steamship Oakwin.

7. (a) The Winston Salem was a general cargo ship with two decks divided into five holds, with bulkheads dividing each hold. The engine and bridge were amidship, with two hatches forward, two aft and one amidship, or five hatches in all. Loading the Winston Salem required a great deal of shifting, as the filling of one hatch had to be stopped while the between hatch beams were put in by the crew and another hatch started.

(b) Because of the character of construction of the Winston Salem, 60 per cent. of the cargo of coal delivered to her required trimming, which is spreading of coal throughout the hold of the ship to provide safe loading to the full capacity.

(c) The cargo of the Winston Salem was to consist of two kinds of coal, about 3,000 tons of pool 60, and about 5,000 tons of pool 63.

8. (a) The Newton was an open ship of the Collier type, specifically constructed for the transportation of coal. She had ten hatches. Her engine and cabins were in the stern. Wing tanks were so located next to the hatches that when coal was dumped into the hatches it closed up all space as it was dumped in. The loading of the Newton could be started at one end and finished at the other, shifting the boat gradually without stopping operations.

(b) The cargo of the Newton called for one kind of coal, 7,600 tons of "Chase" coal. The Newton required 8 or 10 per cent. trimming.

9. (a) During the months of April, May, June, and July of 1921, there was an unusually heavy movement of coal traffic over the Western Maryland lines, due to a rush in the production and export of American coal to Europe occasioned by the British coal strike of 1921.

(b) The movement of coal steadily increased until the peak of congestion at the Port Covington yards was reached on July 5, 1921.

(c) On July 4, 1921, there were a total of 1,710 cars in the Port Covington yards of the Western Maryland Railway Company.

(d) On July 5, 1921, there were a total of 1,722 cars in the Port Covington yards of the Western Maryland Railway Company, and on July 6th there were 1,539 cars in the Port Covington yards of the Western Maryland Railway Company.

10. (a) The total storage capacity of the Port Covington yards of the Western Maryland Railway Company was 1,848 cars, and the total capacity of the yards, allowing for active operation, was not more than 1,000 loaded cars.

(b) More than 1,000 loaded cars in the Port Covington yards seriously handicapped and interfered with the proper movement of the cars.

11. On July 5, 1921, the Port Covington yards were badly congested, and switching operations were slow and were carried out under difficulty and with extra expense to the Western Maryland Railway Company. It was necessary to take unusual and drastic measures in order to relieve the congestion and make proper provision for sending coal over the pier in quantities desired by shippers.

12. The mechanical trimmer was a device for spreading the coal in the hold of the ship. It was operated by a rotating cowl which controlled a radiating arm, which distributed the coal in the hold of the ship.

13. (a) During the loading of the Emlynian at about 3:00 p. m. July 5th, the mechanical trimmer on the Port Covington pier became choked with coal dust and failed to operate.

(b) In the afternoon of July 5th, the rotating parts of the mechanical trimmer choked with coal dust, and the cowl was so jammed that it was impossible to use the mechanical trimmer after that time on July 5th.

14. (a) Because of the difference in construction of the Winston Salem and the Newton, it was possible to load the Newton without the use of the mechanical trimmer in much less time than it would require to load the Winston Salem without the use of the mechanical trimmer.

(b) It would have required from thirty to forty working hours to load the Winston Salem by trimming the coal by hand and without the use of the mechanical trimmer according to reliable estimates.

(c) The actual time taken to load the Newton without the use of the mechanical trimmer was nine and one-half hours.

15. During the time when the Newton was being loaded without the use of the mechanical trimmer, the coal dust which had caked into a substantial hardness in the rotating cowl was saturated with coal oil and the trimmer placed in condition for the loading of the Winston Salem. By the time the loading of the Newton was finished, the coal dust which had accumulated in the cowl had become so softened as to make it possible to use the trimmer on the Winston Salem.

16. The Newton was docked at the Port Covington pier at 5:05 p. m. July 5th, and was fully loaded at 1:35 p. m. July 6th.

17. The working day ended at the Port Covington pier at 3:30 p. m.

18. (a) The Winston Salem was docked at 2:40 p. m. July 6th, and loaded until 6:04 p. m., when the mechanical trimmer again broke down. Loading was resumed at 7:00 a. m. July 7th, and finished at 5:00 p. m. The loading required a total of thirteen and one-half working hours.

(b) 180 cars of coal were placed in the Winston Salem.

19. The actual records of the loading at the Port Covington pier between July 5th and July 8th showed the following: July 5th, 80 cars; July 6th, 132 cars; July 7th, 143 cars; July 8th, 36 cars; or, in twenty-six working hours, 391 cars.

20. By loading the Newton in the registered place of the Winston Salem, 211 more cars were loaded than would have been loaded if the Winston Salem had been loaded in her registered order without the use of the mechanical trimmer.

21. With the mechanical trimmer out of commission, the Winston Salem could not have been loaded on July 6th, even if she had been docked at 5:05 p. m. on July 5th, which was the time of the docking of the Newton.

22. (a) The Winston Salem, owing to her condition and construction, was not suited to the berth which existed at the Port Covington pier at 5:05 p. m. July 5th, when the Newton was berthed for loading.

(b) A suitable berth at the Port Covington pier for the Winston Salem could not have been provided before about 2:00 p. m. on July 6th.

23. The substitution of the Newton in the registered place of the Winston Salem did not make or give any undue or unreasonable preference or advantage, or subject any person, company, firm, or corporation to any undue or unreasonable prejudice or disadvantage under section 3, or under any other section or sections of the Interstate Commerce Act.

24. The defendant was not notified and did not know that the plaintiff had contracts for the sale of coal to be loaded in the Winston Salem, which provided that the Winston Salem should sail from Baltimore on July 5, 1921.

25. If the Winston Salem had been previously berthed in her registered turn at 5:05 p. m. July 5, 1921, when the Newton was berthed for loading, the Winston Salem could not have been loaded on July 5th with the mechanical trimmer in use.

26. The Winston Salem, although her cargo was completed at 5:00 p. m. on July 7th, did not sail from Baltimore until July 9, 1921, at 2:30 a. m.

27. The Winston Salem did not on July 5th, or when she left the Port Covington pier, have all her supplies on board, nor did she have her fuel oil, nor did she have her crew complete. When she left the pier, she did not have her bay pilot aboard.

What is the law applicable to the above facts? The action was brought to recover damages resulting from an unreasonable preference or discrimination in violation of sections 3, 8, and 9 of the Interstate Commerce Act (Act February 4, 1887, 24 Stat. 379). Section 3, par. 1, and section 8 read as follows:

"Sec. 3. para. (1) That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

"Sec. 8. That in case any common carrier subject to the provisions of this act shall do, cause to be done, or permit to be done any act, matter, or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."

Section 9 provides, inter alia, that the person or persons claiming to be damaged may make complaint to the Interstate Commerce Commission, or may bring suit in any United States District Court of competent jurisdiction, and must elect which procedure he or they will adopt.

The main question is, Did the defendant, under section 3 of the Interstate Commerce

Act, give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatever, or subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage, in any respect whatever, or, in other words, did it make or give any undue preference in favor of the charterer of the steamship Newton in having that ship dock and load at its Port Covington pier in the turn of the steamship Winston Salem chartered by the plaintiff, as shown by the registration of arrival at the pier office of the defendant.

The defendant had adopted rules duly posted at the pier for the regulation of said pier. These rules contained the following provision:

"3. Vessels will take their turn in loading at suitable chutes at the pier in the order of their arrival, as registered at the pier office, except as provided in these rules.

"A vessel, owing to size or other conditions, not suited to an unoccupied berth, shall not take its turn until suitable berth can be provided.

"As between a steamer and other vessel arriving on the same date, the steamer shall take precedence, provided it is ready to cargo and cargo is on hand."

That the defendant was within its rights in making these rules there can be no doubt. The rules provided for the time and method of docking vessels and for the means of the use of the pier.

In Baker-Whiteley Coal Co. v. Baltimore & Ohio R. Co. (C. C. A.) 188 F. 405, 408, Judge Brawley, in the opinion, said: "The railroad company would be clearly within its right in making all proper regulations for the use of this pier. It could provide for the time and method of docking and undocking vessels, and make charges for demurrage in all cases where delays occurred from inefficiency or other hindrances to the most rapid and economical use of its pier. It could have reserved the Curtis Bay pier for its own exclusive use, or for the use of such special transportation lines with which it made contracts for transshipment. * * * A wharf or pier devoted to the pubic uses, as was the Curtis Bay pier, is a public station for the shipment of coal, and the railroad company is entirely within its rights in making rules and regulations for its use by shippers and consignees and their vessels; and inasmuch as in present conditions tugs are necessary for the docking and undocking of vessels, the owners of a pier may make such reasonable rules and regulations as to the time and manner of such use as may be necessary. It may prescribe how and when the pier shall be approached, and charge demurrage for any delays which may be injurious to its business."

Defendant did not refuse to allow the Winston Salem to dock and load, but refused to allow the Winston Salem to dock and load at its pier at a particular time when the officers of the defendant felt that the Winston Salem, owing to its construction and condition, was not suited to the berth which was unoccupied at that particular time, but did allow it to dock and load as soon as a suitable berth could be provided. The rules applied to all ships alike, and might be applied to any when the circumstances demanded it.

Section 3 of the Interstate Commerce Act does not denounce every discrimination, preference, and prejudice, but only those that are undue and unreasonable.

In Texas & Pac. Railway v. Interstate Commerce Commission, 162 U. S. 197, page 219, 16 S. Ct. 666, 675, 40 L. Ed. 940, Mr. Justice Shiras, in the opinion of the court, said:

"Commerce, in its largest sense, must be deemed to be one of the most important subjects of legislation; and an intention to promote and facilitate it, and not to hamper or destroy it, is naturally to be attributed to Congress. The very terms of the statute, that charges must be 'reasonable,' that discrimination must not be 'unjust,' and that preference or advantage to any particular person, firm, corporation, or locality must not be 'undue' or 'unreasonable,' necessarily imply that strict uniformity is not to be enforced, but that all circumstances and conditions which reasonable men would regard as affecting the welfare of the carrying companies, and of the producers, shippers, and consumers, should be considered by a tribunal appointed to carry into effect and enforce the provisions of the act."

█ It is proper, under section 3 of the Interstate Commerce Act, to give a preference or an advantage or to discriminate between persons, localities, or traffic, but not to make them undue or unreasonable. Interstate Commerce Commission v. Alabama Midland Ry. Co., 168 U. S. 144, 18 S. Ct. 45, 42 L. Ed. 414; Cincinnati, New Orleans & Texas-

Pacific Railway Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 S. Ct. 700, 40 L. Ed. 935.

Whether, in particular instances, there has been an undue or unreasonable preference or prejudice, or whether the circumstances and conditions of the action have been substantially similar, or otherwise, are questions of fact depending on the matter proven in each case. Interstate Commerce Commission v. Alabama Midland Railway supra.

"This section forbids any undue or unreasonable preference or advantage in favor of any person, company, firm, corporation, or locality; what is such undue or unreasonable preference or advantage is a question not of law, but of fact." Pennsylvania Co. v. United States, 236 U. S. 351, 35 S. Ct. 370, 373, 59 L. Ed. 616.

What then were the matters proven in the case relating to the substitution of the Newton for the Winston Salem at the coal pier of the defendants?

The coal strike in Wales was in effect from April 1, 1921, until July 4, 1921, during which time British coal was practically out of the world market. There was during the period much demand for American coal in Italy, which demand increased as the strike continued. American concerns in the business of exporting coal were rushing production in order to take advantage of the high prices which prevailed abroad.

The quantity of coal shipped over the line of the defendant from the West to the defendant's pier at Port Covington, Md., constantly increased during the period. The lines became seriously congested in July. In the early weeks of the strike, the defendant was forced to and did put into effect a permissive embargo, and no coal was shipped over defendant's line without a permit from the traffic department of the defendant, and in June demand was made upon defendant's traffic department to declare an absolute blockade.

The midnight car report for July 3, 1921, showed a total of 1,551 cars in the Port Covington yards, of which 1,471 were coal. From the midnight coal report of July 4, 1921, there were a total of 1,710 cars in the Port Covington yards, including 1,610 loaded coal cars. On July 5, 1921, there were 1,722 cars in the Port Covington yards, of which 1,646 cars contained pier coal. After July 5th, the number of cars at the Port Covington yards steadily decreased. The Port Covington yards had a capacity allowing for movement of cars of not more than 1,000 cars. On July 5th, the yards were dangerously congested, and operation was difficult and expensive.

On July 5th, there were five ocean-going vessels in the stream waiting to be loaded with coal at defendant's pier. All ships were urging the defendant to rush loading. More than 1,600 cars of coal were in the Port Covington yards. A critical condition had arisen.

D. G. Gray, vice president of traffic of the defendant, testified that, to relieve the congestion, it was necessary to "blow a hole in the yard" or declare a complete blockade on the whole line, in which case no cars would be accepted for shipment, and cars in transit would not reach Port Covington pier.

The Emlynian was docked at the pier at 8:00 a. m. July 3d, was loaded and left the pier at 4:00 p. m. July 5th. The Winston Salem was next in turn on the registry at the pier office. On the afternoon of July 5th, the mechanical trimmer broke down.

Defendant's pier cost to construct about $1,000,000, and was the first electrically operated high lift dumper. It was put into operation in April, 1921.

On the completion of the loading of the Emlynian on the afternoon of July 5th, the rotating parts of the mechanical trimmer were choked with coal dust. It was not possible to use the trimmer for the distribution of the coal throughout the holds of a vessel of the type of the Winston Salem. It was necessary to repair the trimmer before it could be used.

The Winston Salem was a general cargo boat, with two decks, and was divided into five holds, with bulkheads dividing each hold. Her engines and bridge were amidships, with two hatches forward, two aft, and one amidship, or five hatches in all. In loading she required shifting, as the filling of one hatch would have to be stopped while the between deck hatch beams were being put in by the crew, and another hatch would have to be started; then, later, it would be necessary to return to the first hatch and fill from the beams up. The vessel was to be loaded with two kinds of coal, 3,101.05 tons of pool coal 60, and 4,880.12 tons of pool coal 63. It was necessary that the lots should be kept separate by being loaded into separate holds. The Winston Salem, due to her construction, required trimming of 60 per cent. of her cargo. It was estimated that without using the mechanical trimmer, and by having the coal trimmed by hand, and using from eighty to

ninety stevedores, it would have taken thirty to thirty-six hours to have loaded her cargo. Another witness estimated that it would have taken from thirty-six to forty hours to have loaded the Winston Salem under similar conditions.

On the other hand, the Newton was classed as an open ship. She was of the Collier type, and especially constructed for the transportation of coal. She had ten cargo hatches, which were large. Her engines and cabins were in the stern. Wing tanks were so located next to the hatches that when coal was dumped into the hatches it closed up all space as it was dumped in. Unlike the Winston Salem, in loading the Newton, the loaders could start at one end and finish up at the other, shifting the boat gradually without stopping operations. She was to be loaded with only one kind of coal, 7,693.05 tons of "Chase" coal. Not more than 8 per cent. or 10 per cent. of her cargo required trimming. Without the use of the mechanical trimmer, she could be loaded in about nine and one-half hours. On one occasion, the Newton was loaded at the Curtis Bay coal pier in four and one-half hours.

The officers of the defendant were properly anxious to relieve the congestion in the yards, and to avoid a blockade on the whole line. It was necessary to release as many cars as possible in the yards in the shortest time possible. The officers decided that it was to the interest of all shippers on their lines that the Newton should be loaded next, and at the same time the mechanical trimmer should be repaired. The Newton could be loaded quickly without the use of the mechanical trimmer. In order to expedite loading, therefore, the Newton was brought in and docked at the coal pier at 5:05 p. m. July 5th, and the men worked over time loading her until 8:30 p. m. Loading was resumed at 7:00 a. m. July 6th, and finished at 1:35 p. m. July 6th, or was loaded in nine and one-half working hours in all. The Newton was loaded by tilting the trimmer back from the cowl and dropping the coal through the telescopic chute without the use of the mechanical trimmer. While the loading progressed the coal dust which had caked in the rotating cowl was saturated with kerosene and lubricating oil, and worked in by moving the cowl backward and forward with the motor. By the time the loading of the Newton was finished, the coal dust which had accumulated in the cowl had become softened so as to make possible the use of the trimmer on the Winston Salem.

The Winston Salem was docked about 2:00 p. m. on July 6th. She was loaded until 6:04 p. m., when the mechanical trimmer broke down. Loading was resumed at 7:00 a. m. July 7th, and finished at 5:00 p. m. The loading of the Winston Salem required in all about thirteen and one-half working hours instead of from thirty to forty hours, as would have been required if loaded before the Newton and trimmed by hand. Weigert, superintendent of the coal pier, calculated that he was able to load the Newton, the Winston Salem, and the Terrier with 391 cars of coal by the substitution of the Newton for the Winston Salem. If the substitution had not been made, he would have been able to load in the same time the Winston Salem only with 180 cars; or, in other words, by the substitution he relieved the yards of 211 cars more than without the substitution.

It is true that, if the Winston Salem had come in in her registered turn, the mechanical trimmer might have been repaired by 2:00 p. m. on July 6th, and used for loading the Winston Salem after that hour, but the officers did not know how long it would take to repair the mechanical trimmer. They did know that the mechanical trimmer could not be used, and that the Winston Salem was the type of ship which required the mechanical trimmer, and the Newton was the type of ship which did not. In other words, the Winston Salem, owing to her construction and the conditions, was not suited to the unoccupied berth which existed at defendant's coal pier on July 5th when the Newton was docked for loading.

The charterer of the Newton, the New England Coal & Coke Company, was not shipping the cargo of the Newton to any point abroad. There was no prejudice on the part of the plaintiff against the defendant, or any bias in favor of the New England Coal & Coke Company. The substitution of the Newton for the Winston Salem resulted in no profit to the defendant. The advantage which resulted was to the defendant and to all other shippers in relief of congestion at defendant's pier and on defendant's lines.

■ In passing upon the question of undue or unreasonable preference or advantage, it is proper to take into consideration, besides loading of one vessel at a carrier's pier in the turn which had been previously assigned to another, elements such as the convenience to the public, convenience to other shippers, the fair interest of the carrier, and the volume of traffic involved, as well as other circumstances. This is consistent with the rule laid down

in many English cases, as well as in Interstate Commerce Commission v. Baltimore & Ohio R. R. Co. (C. C.) 43 F. 37, 53; in Interstate Commerce Commission v. Louisville & N. R. R. Co. (C. C.) 73 F. 409; and other cases that might be cited.

In Interstate Commerce Commission v. Baltimore & Ohio R. R. Co. supra, Judge Jackson in the opinion stated:

"The English cases referred to above, and others that might be cited, establish the rule that, in passing upon the question of undue or unreasonable preference or disadvantage, it is not only legitimate, but proper, to take into consideration, besides the mere differences in charges, various elements, such as the convenience of the public, the fair interest of the carrier, the relative quantities or volume of the traffic involved, the relative cost of the services and profit to the company, and the situation and circumstances of the respective customers with reference to each other, as competitive or otherwise. The English decisions cited, and the case of Denaby Main Colliery Co. v. Manchester, etc., Railway Co., L. R. 11 App. Cas. 97, 55 Law J. Q. B. 181, further established that the burden of proving the undue preference or the undue prejudice rests upon the complaining party."

There is in this case in my opinion no undue or unreasonable preference, or any undue or unreasonable prejudice or disadvantage under section 3 of the Interstate Commerce Act. Taking into consideration the congestion in the Port Covington yards, the time it would take to load the Winston Salem due to her construction, the printed rules of the defendant, the expense to the defendant as a result of the congestion, the rights of other shippers, and other conditions which existed at the Port Covington pier on July 5th, the defendant was within its rights in docking and loading the Newton in the registered turn of the Winston Salem, and its action in doing so was reasonable and proper.

The plaintiff contends, which contention is not supported by the evidence, that it had sold the cargo of the Winston Salem (about 8,000 tons of coal with the exception of about 650 tons) to customers under contracts dated June 25, 1921, and June 27, 1921, which contracts provided for the delivery of coal in Venice, and contained the following provision:

"Delivery upon arrival of the steamer scheduled to sail from Baltimore on or before July 5th of the name of which vessel we shall inform you as soon as we receive the corresponding advices."

On June 25, 1921, and June 27, 1921, no schedules had been made as to the date or times before which the Winston Salem would sail from Baltimore. In fact, the Winston Salem was not registered at the Port Covington pier until 10:50 a. m. on July 2, 1921, and at no time was the Winston Salem scheduled to sail from Baltimore on or before any particular date.

Assuming that such contracts as those above referred to did exist, and that they were valid and binding, could the Winston Salem have sailed from Baltimore on or before July 5th if she had been docked for loading in her registered turn at the Port Covington pier?

It is conceded that the time for the turn of the Winston Salem did not arrive until 4:30 p. m. or 5:00 p. m. July 5th, the Emlynian, with the turn next previous, having left the pier at 4:00 p. m. July 5th. It required thirteen and one-half hours working time to load the Winston Salem with a mechanical trimmer in operation, which meant that the Winston Salem could not have been loaded before the morning of July 6th, even if workmen could have been procured to work after 9:00 p. m. on July 5th. There is no competent evidence in the case that workmen were or could be procured to work overtime after 9:00 p. m. If, therefore, loading had been commenced at 5:00 p. m., and continued until 9:00 p. m., and resumed at 7:00 a. m. on July 6th, with the use of the mechanical trimmer, the Winston Salem could not have left the coal pier with her cargo before 4:30 p. m. July 6th.

The plaintiff contends that, if the Winston Salem had been berthed in her registered turn on July 5th, the date of the ocean bill of lading would have fixed the date of sailing of the Winston Salem July 5th, even if the cargo had not been actually received on board; and that any contracts for the sale of the coal for delivery after arrival of the steamer scheduled to sail from Baltimore July 5th would have been complied with, with respect to the date of sailing from Baltimore.

Mr. Justice Miller, in Pollard v. Vinton, 105 U. S. 7, 8, 26 L. Ed. 998, in speaking of the bill of lading, says:

"It is an instrument of a two fold character. It is at once a receipt and a contract. In the former character it is an acknowledg-

ment of the receipt of property on board his vessel by the owner of the vessel. In the latter it is a contract to carry safely and deliver. The receipt of the goods lies at the foundation of the contract to carry and deliver. If no goods are actually received, there can be no valid contract to carry or to deliver."

The date of the bill of lading, therefore, is merely the date on which the owner of the vessel receives the property on board. After a vessel has done this, she may not sail for days or weeks thereafter. Plaintiff's customers in Italy, assuming the existence of contracts as contended by plaintiff, were desirous of having this coal rushed to Venice as speedily as possible. They were interested in the date when a ship would sail from Baltimore with the cargo. The alleged contracts provided the date on or before which the vessel should sail from Baltimore with the cargo, and did not provide the date on or before which the owner of the vessel should receipt for the cargo. The contracts could mean nothing other than that which the plain language stated. A bill of lading for goods not actually received on board a vessel does not bind the vessel or its owner, and such a bill is void even in the hands of a transferee in good faith and for value. Pollard v. Vinton, supra.

The rule is that a vessel "sails" from the port when she has her cargo on board which she intends to carry, is in complete readiness for the voyage with stores and crew aboard. 26 Cyc. 639; Northland Navigation Co. v. American Merchant Marine Ins. Co., 214 App. Div. 571, 212 N. Y. S. 541 (1925); and other cases that might be cited.

The evidence shows that on July 5th the Winston Salem did not have her stores or crew aboard, and that she could not have had her cargo on board, or in complete readiness to sail on that date. The Winston Salem could not have sailed from Baltimore on July 5th, and for reasons not in any way connected with the refusal of the defendant to dock the Winston Salem at the Port Covington pier in her registered turn.

When all the facts are considered together, the conclusion must be reached that the preference and advantage was not "undue" or "unreasonable," and section 3 of the Interstate Commerce Act was not violated, nor was section 8 of that act; and that the reversing of the turns of the Winston Salem and the Newton at the Port Covington pier, or the substitution of the Newton for the Winston Salem was not the proximate cause of the failure of the Winston Salem to sail from Baltimore on July 5, 1921.

This conclusion against the plaintiff having been reached, the question of damages does not require the consideration of the court.

Judgment is directed to be entered for the defendant, the Western Maryland Railway Company, and against the plaintiff, the Archibald McNeil & Sons Company, Inc., of New York.