**CITY OF CHICAGO and Board of Trade of the City of Chicago, Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

No. 66 C 524.

United States District Court
N. D. Illinois, E. D.
July 25, 1968.

Raymond F. Simon, Corp. Counsel, Mathias M. Mattern, Asst. Corp. Counsel, Chicago, Ill., for the City of Chicago.

Nuel D. Belnap, Harold E. Spencer, Chicago, Ill., for the Bd. of Trade of City of Chicago.

Robert W. Gimmane, Gen. Counsel, Leonard S. Goodman, Asst. Gen Counsel, Betty Jo Christian, Washington, D. C., for the I. C. C.

William J. O'Brien, Jr. and John H. Doeringer, Chicago, Ill., John H. Durkin, Chicago Heights, Ill., John W. Adams, Jr., Mobile, Ala., Thomas O. Broker, Roanoke, Va., for Chicago & Eastern Ill. R.R., Gulf Mobile, Ill., Central Norfolk & Western.

Thomas A. Foran, U. S. Atty., Chicago, Ill., Donald F. Turner, Asst. Atty. Gen., John H. D. Wigger, Atty., Ramsey Clark, Atty. Gen. of U. S. Dept. of Justice, Washington, D. C., for the United States.

Louis A. Schwartz, New Orleans, La., for New Orleans Traffic & Transportation Bureau.

Franklin C. Gagen, for Allied Mills, Central Soya, Lauoff Grain & Ralston Purina.

Thomas V. Fischer, Decatur, Ill., for A. E. Staley Mfg. Co.

William H. Towle & Clarke J. Munn, Jr., Chicago, Ill., for Swift & Co.

Winston, Strawn, Smith & Patterson, Chicago, Ill., for Archer-Daniels Midland Co.

Before SCHNACKENBERG, Circuit Judge, and PERRY and WILL, District Judges.

OPINION

WILL, District Judge.

This is an action under the provisions of 28 U.S.C., sections 1336, 1398, 2284 and 2321–2325, and 5 U.S.C., section 1009, to set aside, annul, and permanently enjoin a report and order of the Interstate Commerce Commission (Commission), dated May 10, 1965, as amended, and a report and order dated March 13, 1967, both entered in a proceeding known as Docket No. 34348 Board of Trade of the City of Chicago v. Illinois Central Railroad Company, et al. The report and order of May 10, 1965 is reported at 325 I.C.C. 412, the order appearing on pages 421–422. The report and order of March 13, 1967 is reported at 329 I.C.C. 525, the order appearing on page 538.

At the time of the filing of the complaint before the Commission, the railroads who were defendants in the Commission proceeding, intervening defendants here, maintained rates on soybeans to Chicago, when for export, from origins in central and southern Illinois which, relative transportation services considered, were approximately 150 per cent of the level of the rates on soybeans to Gulf ports, when for export, from the same origins. From some origins in Southern Illinois, the rates to Chicago were actually higher in cents per 100 pounds than the rates to New Orleans, although the distances to New Orleans from such origins averaged about two and one-half times those to Chicago. The complaint of the Board of Trade of the City of Chicago (hereinafter sometimes referred to, with respect to the Commission proceedings, as the "complainant"), in which the Department of the Port of the City of Chicago intervened in support of the complainant, alleged that the rates maintained by the railroad defendants were unjust and unreasonable in violation of section 1(5) of the Interstate Commerce Act (the Act),[1] and were unduly prejudicial to Chicago and unduly preferential of Gulf ports in violation of section 3(1) of the Act.[2]

This case arose before the Commission upon the complaint of the Board of Trade of the City of Chicago, alleging that export rail rates on soybeans from Illinois origins to Chicago are unjust and unreasonable in violation of Section 1 of the Act, and are unduly prejudicial to Chicago and unduly preferential of Gulf ports in violation of Section 3(1). Interested parties intervened in support of both the complainant and the railroads, and hearings were held before an examiner of the Commission.

In his recommended reports and order, the Commission examiner concluded that the existing rates had not been shown to be unjust and unreasonable, but recommended that such rates be held to result in undue preference and prejudice, both where the rate to Chicago was higher than that to the gulf ports, and where it was lower.

On exceptions, Division 2 of the Commission agreed that complainant had failed to prove that the rates were unjust and unreasonable in violation of Section 1(5). In regard to Section 3(1), the Division concluded that the port of Chicago was entitled to rate parity with

1. Section 1(5) of the Interstate Commerce Act, 49 U.S.C. § 1(5):

"All charges made for any service rendered or to be rendered in the transportation of passengers or property, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

2. Section 3(1) of the Interstate Commerce Act, 49 U.S.C. § 3(1):

"It shall be unlawful for any common carrier subject to the provisions of this part to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever * * *."

the Gulf ports, but had not shown that it was entitled to more favored rates. Accordingly, the Division held that undue prejudice to Chicago existed only where the rates were in fact higher than to the competing Gulf ports, and ordered the rates adjusted to eliminate the discriminatory treatment.

Petitions for reconsideration were denied by Division 2, acting as an Appellate Division, and a petition requesting that the case be found to involve an issue of general transportation importance was denied by the entire Commission. However, after the initial complaint had been filed with this Court, the Commission—with the consent of this Court—on its own motion reopened the proceeding for reconsideration on the existing record.

In its final decision, the entire Commission concluded that the rates had not been shown to be unjust and unreasonable, and that insofar as Chicago already enjoyed a rate advantage vis-a-vis the Gulf ports, complainant had failed to show that Chicago was under any undue prejudice. Any reduction in the rate to Chicago would, the Commission found, result in injury to the soybean processors located in central Illinois, putting them at a competitive disadvantage in foreign markets. The Commission further noted that under the rate level sought in the complaint, "the Gulf ports would be disadvantaged," and that this might well result in "creating a preferential situation in treating the one of which complaint is made" (329 I.C.C. at 535).

The relevant facts are that Illinois is the largest soybean producing state in the United States. Nearly one-fourth of the total national production emanates from Illinois. Seventy per cent of the Illinois production in turn is in central Illinois. The four railroads here involved serve 599 points of origin in central Illinois from which the average mileage to Chicago is 172 miles and the average mileage to New Orleans is 829 miles.

From the southernmost point of origin in Illinois, Cairo, the distance to Chicago is 365 miles and to New Orleans, 553 miles, the rate per hundredweight fixed by the Commission is 20.5¢ to both Chicago and New Orleans. From Marion, the respective distances are Chicago, 327 miles, New Orleans, 591 miles, and the rate fixed is 25.5¢ to both cities. Prior to the instant proceedings, the rate from Marion to Chicago was fixed at 36¢, that to New Orleans was, as it remains, 25.5¢. Centralia is 252 miles from Chicago, 666 miles from New Orleans, and the rate to both is 28.5¢. Prior to the Commission's action, the rate to Chicago was fixed at 32.5¢ while the New Orleans rate was then, as now, 28.5¢. Although Centralia is 113 miles closer to Chicago than Cairo, the rate from Centralia is 8¢ per hundred-weight higher than from Cairo. Centralia is 75 miles closer to Chicago than Marion, yet the rate is 3¢ per hundred-weight higher from the former. Decatur, which is 169 miles from Chicago and 749 miles from New Orleans, has been assigned a rate of 26.5¢ to Chicago and 38.5¢ to New Orleans. The same rates, 26.5¢ to Chicago and 38.5¢ to New Orleans, are provided for shipments from Champaign, 128 miles from Chicago and 790 miles from New Orleans; Gibson City, 110 miles from Chicago and 808 miles from New Orleans, and Gilman, 81 miles from Chicago and 837 miles from New Orleans. The most dramatic contrast in the rates is, of course, between Gilman to Chicago, a distance of 81 miles for which the rate is 26.5¢, or six cents more than the rate from Cairo to Chicago, a distance of 365 miles for which the rate is 20.5¢.

In contrast, the miles and rates to Chicago from points of origin generally north and west of those previously referred to are as follows: Pontiac, 106 miles, 15¢; Dixon, 114 miles, 13.5¢; Rockford, 87 miles, 13.5¢; Freeport, 114 miles, 15¢.

It is apparent from the foregoing that the rates approved by the Commission have at best a very remote relationship to services and mileage involved. Unfortunately, the Commission in its reports and orders, while concluding that this rate structure was just and reasonable and did not result in any undue prejudice or disadvantage, failed to elucidate any for-

mula, philosophy or findings on which these conclusions could rationally be based other than to conclude that Chicago was not competitively disadvantaged thereby.

Section 8(b) of the Administrative Procedure Act, 5 U.S.C. Sec. 1007(b), requires that

> "All decisions * * * shall * * * include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; * * *."

 The Commission in its brief before this Court urges that the determination of whether a rate results in undue preference and prejudice is a complex fact question confided by Congress to the Commission for its determination on the record as a whole. With this general observation there can be no serious dispute and numerous decisions so hold.[3] Such a determination however, must be based on an understandable and identifiable rationale and not simply on some secret mystic divination or what the late Judge Frank once described by the coined phrase of "woosh-woosh."[4]

An examination of the Commission's performance here reveals how devoid of findings, criteria or other supporting rationale the approved rate structure is. At the outset, the Commission acknowledges, as it must, that the rates in question are not related primarily to distance and transportation services and asserts that these are not the only factors to be weighed in fixing rates, particularly export rates. It urges that, as a policy matter, rail rates should be fixed so as to encourage competition among various ports by giving shippers alternatives which are relatively cost-equal.

Plaintiffs deny that the Commission possesses any such expert equalization authority and point out that, in any event, there must be some limit to this policy or rail rates to Chicago on cotton, sugar, crude oil and a host of other products produced primarily in areas other than the Middle West would have to be set low enough to enable Chicago to compete with Galveston, New Orleans, Mobile and other ports. The Commission in its findings and orders enunciates no formula or philosophy as to why the highly disparate rates here are necessary or even appropriate to encourage such competition.

It seems obvious that the competition between the ports of Chicago and New Orleans for soybean traffic must be affected by a number of factors other than rail rates. For example, the ultimate destination of the export shipments inevitably must be a factor. Soybeans or meal destined for Canadian customers are not likely to be shipped from New Orleans regardless of the rail rates and, conversely, shipments destined for South America or the Orient are not likely to depart through Chicago. Yet there is no analysis of this factor.

The record is barren of any evidence as to the basis for concluding that the rate pattern approved by the Commission will result in greater competition between the ports. Absent some information as to the other relevant factors, including destinations, shipping rates thereto, terminal costs, and the other cost elements which are necessary to complete the competitive picture, there is nothing to substantiate the Commission's conclusions except its naked expertise.

 The Court acknowledges, of course, the limited scope of its power to review Commission determinations. Where adequate findings supported by substantial evidence upon the record as a whole are made by the Commission, a reviewing court must affirm.[5] Where,

3. E. g., State of New York v. United States, 331 U.S. 284, 347, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947); United States v. Chicago Heights Trucking Co., 310 U.S. 344, 352–353, 60 S.Ct. 931, 84 L.Ed. 1243 (1940); Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659 (1937); Pennsylvania Co. v. United States, 236 U.S. 351, 35 S.Ct. 370, 59 L.Ed. 616 (1915). See, also,

Board of Trade of Kansas City v. United States, 314 U.S. 534, 546, 548, 62 S.Ct. 366, 86 L.Ed. 432 (1942).

4. Old Colony Bondholders v. New York, N. H. & H. R. Co., 161 F.2d 413, 450 (2d Cir. 1947).

5. See, e. g., Illinois Central R.R. Co. v. Norfolk & Western Ry. Co., 385 U.S.

as here, the Commission finds that disparate rates are neither unreasonable nor prejudicial, so long as the rate to Chicago is never greater than that to New Orleans, regardless of other factors, including other cost factors, quantities shipped from various points of origin, destinations, etc., it cannot be said that the finding is supported by substantial evidence.

The Commission does point out that more soybeans grown in Illinois are now shipped through Chicago than through Gulf ports. This can hardly be called substantial evidence in support of the Commission's findings since the rate structure would have to be unreasonable and prejudicial in the extreme if more Illinois grown soybeans and soybean products were shipped through Gulf ports, an average of 829 miles from Illinois points of origin, than were shipped through Chicago, an average of 127 miles therefrom.

There may very well be a sound economic basis for the rate structure approved by the Commission notwithstanding its apparent irrationality. If there is, it does not appear in the Commission's findings and decisions.

The examiner found that the then existing rates had not been shown to be unjust and unreasonable but that they did result in undue preference and prejudice, both where the rate to Chicago was higher than that to the Gulf ports, even though distance and services were less, and also where it was lower.

Division 2 of the Commission agreed with the examiner that the rates had not been shown to be unjust and unreasonable in violation of section 1(5). In regard to section 3(1), the Division concluded that plaintiffs had established that the rates resulted in undue preference and prejudice only to the extent that they were higher to Chicago than to New Orleans.

Petitions for reconsideration were denied by Division 2, acting as an Appellate Division, and a petition requesting that the case be considered by the entire Commission as one involving an issue of general transportation was denied. After this action was filed, however, the entire Commission on its own motion and with the Court's approval, reopened the proceeding for reconsideration on the existing record and affirmed the conclusions of Division 2. It concluded without supporting findings that any further reduction in the rates to Chicago would be disadvantageous to the Gulf ports and would result in injury to soybean processors located in central Illinois by putting them at a competitive disadvantage with processors in foreign countries.

The latter conclusion is particularly interesting and illustrates the complicated economic thicket through which one must make his way if railroad rates are to be used as protective weapons in foreign trade. The contention of the processors is that if rates on soybeans are reduced it will enable foreign processors to buy the whole beans and process them at a cost which will make soybean oil and meal cheaper in the foreign markets than it now is when processed in the United States and shipped in processed form.

It is obvious that a whole host of factors quite apart from rail rates on whole soybeans are necessarily involved in any such conclusion. Rail rates on soybean oil and meal will determine in part the delivered cost in foreign markets of the processed products. Relative shipping rates, terminal costs and other relevant costs on whole soybeans, meal and oil are equally pertinent. Present profit margins of the central Illinois processors are certainly relevant, since the Commission should not be fixing rail rates so as to assure an excessive price and profit.

Yet, no findings with respect to these factors were made by the Commission in support of its conclusion that lower rates to Chicago would prejudice central Illinois processors and were therefore unwarranted.

While the Commission undoubtedly has authority to fix rates, taking into

57, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 618–621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

consideration other factors than transportation services involved, this case illustrates nicely the complexities inherent in considerations of equalization, competition, protection of domestic as against foreign manufacturers or processors, etc. Similarly, the effect of other forms of competing transportation services may be relevant. If the Commission determines it has authority to consider and that the particular rates require consideration of these added factors, then it must make findings, elucidate its analysis, and make understandable the justification for rates as widely disparate in relation to services as are those here involved and not simply "woosh-woosh," the conclusion that they are reasonable and just and neither unduly preferential nor prejudicial.

Both sides have vigorously argued the question of whether equality of rates automatically obviates undue preference and prejudice under Section 3(1) of the Act as amended, the plaintiffs contending that equal rates for unequal services may be just as discriminatory and prejudicial as the converse, unequal rates for equal services. The defendants assert that by the 1935 amendment to Section 3(1), Congress intended to authorize the Commission to fix equal rates for unequal services where ports of export are involved.

While we conclude that the Commission has failed to make adequate findings and that the case must therefore be returned to it for further proceedings consistent with the views expressed herein, the questions of whether the Commission has authority to fix rates so as to protect domestic processors against foreign competition, or to fix equal rates for unequal services where transportation to ports of export is involved, are not here decided. Nor do we decide whether simple equality of rates without regard to services precludes undue preference or prejudice under Section 3(1) of the Act.

We hold solely that on the record before us, the Commission has failed to make adequate findings to justify the conclusion that, as the dissenting opinion of Commissioner Murphy points out, rates involving as much as a 270% differential between Chicago and New Orleans are reasonable in the light of all relevant factors and not unduly preferential or prejudicial. The case is remanded to the Interstate Commerce Commission for further proceedings consistent herewith.

SCHNACKENBERG, Circuit Judge (concurring).

Whether intended by the Commission or not, the order of the Interstate Commerce Commission imposes an unjust limitation on the successful operation of the international seaport of Chicago.

PERRY, District Judge.

I concur in the result and agree that the case should be remanded to the Interstate Commerce Commission for more specific findings.